292 N.J. Super. 333 (1996)
678 A.2d 1135
WILLIAM VALLEJO, BY HIS GUARDIAN, AMPARO MORALES, PLAINTIFFS-APPELLANTS,
v.
RAHWAY POLICE DEPARTMENT, CITY OF RAHWAY, AND DAVID JACKSON, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 5, 1996.
Decided July 18, 1996.
*337 Before Judges DREIER, STEIN and CUFF.
Alan D. Bell argued the cause for appellants.
Gerard P. DeVeaux argued the cause for respondents Rahway Police Department and City of Rahway (Karcher, Salmond, Rainone & Barrett, attorneys; Mr. DeVeaux, of counsel; Jarrod W. Harmon on the brief).
Antonio J. Casas argued the cause for respondent David Jackson (Wilentz, Goldman & Spitzer, attorneys; Kevin A. Calamoneri, of counsel and on the brief).
The opinion of the court was delivered by CUFF, J.A.D.
*338 William Vallejo suffered severe brain damage in an aborted suicide attempt while detained in a cell at the Rahway Police Department. Through his guardian, plaintiff has asserted negligence claims against a police officer, the police department and the municipality and civil rights claims against the police department and the municipality. Tried to a jury, judgment was entered in favor of the defendants. We conclude that the negligence claims against the police officer should not have been dismissed and errors in the charge require a new trial. We affirm the dismissal of the civil rights claim.
At approximately midnight on January 7, 1990, Officers David Jackson and Robert Conroy responded to a report of domestic violence. Plaintiff's girlfriend, Elba Delgado, with whom he lived, was holding a butcher knife and her forearm was bleeding. She told the officers that they argued when he took a knife from the kitchen and that he stabbed her as she tried to defend herself. In a certification submitted in opposition to defendant Jackson's motion for summary judgment and at trial, Ms. Delgado asserted that she informed Jackson at the scene that plaintiff had threatened to kill her and himself. Jackson insists that Delgado relayed this information to him at the police station and contemporaneously with the discovery by another officer that Vallejo was hanging from the bars in his cell.
It is undisputed that at the time of the incident and when placed in the cell at police headquarters, Vallejo was intoxicated. According to Officers Jackson and Conroy, when they confronted Vallejo in his bedroom, he was composed and complied with all requests. He remained calm and cooperative while he was transported to the police station and processed prior to being placed in a cell. Plaintiff inquired if he could make a phone call; Jackson advised him to wait until bail was fixed. Jackson observed that plaintiff seemed to understand the advice. After he placed plaintiff in his cell at 12:45 a.m., Jackson made a log entry. He noted that plaintiff was intoxicated.
*339 Russell Tyrell occupied the cell next to plaintiff. He recalled that, when the police officer brought plaintiff to the cellblock, he was "weaving" and "wasn't listening very good because the officer had to tell him twice everything that he did." About five minutes after plaintiff was left in the cell, Tyrell heard sounds coming from plaintiff's cell "like he was throwing up." The noise continued for five to ten minutes. About five minutes after the "vomiting" sound stopped, an officer returned to the cell.
Kevin Ferrence was in the cell on the other side of plaintiff. He remembered that plaintiff had asked to call his sister and that the police officer told him he would "be back in a minute." After the officer left, Ferrence heard "[a sound] like he was moaning a little bit. [Plaintiff] sounded like he was upset and then all of a sudden, he was dry heaving." He also testified that he heard plaintiff pacing back and forth in his cell and concluded that he was depressed.
That evening Sergeant Joseph Visco was working in the communications room with a "direct view" of plaintiff's cell from a window. The cell was also monitored by an electronic video surveillance system. Cell checks could be accomplished by watching the monitors, walking into the cellblock, or looking through the window of the communications room. According to Visco, unless the detained person was on suicide watch, an occupied cell would be checked every thirty minutes.
At 1:00 a.m., fifteen minutes after Vallejo had been placed in the cell, Visco checked his cell by looking through the communications room window. He made a note in the log that Vallejo was intoxicated and sitting down.
At 1:15 a.m., a half-hour after Vallejo was placed in the cell, Visco checked the monitor and saw "something against the bars which I couldn't quite make out." Standing up, Visco saw that plaintiff was "hanging from the cell bars." Visco alerted the shift commander, ran to get Jackson, and told Jackson to follow him because "the prisoner had hung himself."
*340 When Visco and Jackson reached the cell, Vallejo was hanging by the neck from his shirt. Visco reached through the bars to hold Vallejo up. Jackson entered the cell, grabbed plaintiff by the waist and lifted him up to remove the pressure from his neck. Conroy relieved Jackson who cut the shirt from plaintiff's neck.
Visco and Conroy administered CPR and Jackson administered oxygen. At 1:40 a.m., plaintiff was taken to the hospital. He survived, but he suffers from post-anoxic encephalopathy with an organic mental syndrome and motor dysfunction due to the deprivation of oxygen to the brain.
Jackson testified that, if he had known that plaintiff had threatened to kill himself at the time plaintiff entered the cell, he would have notified his superiors. Lieutenant Lampkin, the shift commander, testified that if the officers had known that plaintiff was a suicide threat, the detainee log would have been marked in large red letters and his cell would have been checked every fifteen minutes. Moreover, his clothes would have been removed and he would have been issued a jumpsuit which would tear under pressure and could not have been utilized to fashion a noose.
Plaintiff raises eight points on appeal. Several of the errors raised by plaintiff are clearly without merit. R. 2:11-3(e)(1)(E). We address only the summary judgment orders concerning the negligence claim against Officer Jackson and the federal civil rights claim against the City, the charge on special circumstances, the exclusion of a portion of Dr. Brick's testimony, and the failure to provide a limiting instruction concerning defendants' "deliberate act" argument.

I
After seven days of trial and just prior to summations and charge, the trial judge was substituted. We reject plaintiff's argument before us that a mistrial should have been declared and that he is entitled to a new trial based solely on the substitution of the trial judge in the closing stages of the trial. Plaintiff argued vehemently against a mistrial in the trial court, and he will not be *341 heard in this court to urge a contrary position. Spedick v. Murphy, 266 N.J. Super. 573, 593, 630 A.2d 355 (App.Div.), certif. denied, 134 N.J. 567, 636 A.2d 524 (1993).
Beyond the mere event of substitution of the trial judge, plaintiff argues that the charge delivered by the newly substituted trial judge was inadequate because the substituted trial judge had no familiarity with the record. Therefore, he was unable to relate the law to the facts of the case.
During his charge the trial judge told the jury that "[i]n determining whether reasonable care has been exercised, you will consider whether ... the defendant ... ought to have perceived under the attending circumstances that the natural and probable consequences of his act or omission ... would ... cause some injury." He told them "[i]t's not necessary the party had anticipated the very occurrence, which resulted from the wrongdoing, but it was sufficient that it was in the realm of foreseeability that some harm might have occurred." He elaborated on foreseeability:
If an ... ordinary police officer, under similar circumstances and by the use of ordinary care could have perceived the result, and either would not have acted or if he did act, would have taken precaution to avoid the result[,] ... [t]hen the performance of the act or failure to take such precautions would constitute negligence.
The judge charged them at length on the duty of care and the effect of "special circumstances" on that duty:
Let me tell you ... what the duty of care that the City of Rahway owes to a prisoner. The City of Rahway owes a duty to a prisoner, that is the plaintiff, to keep them safe and to protect them from unnecessary harm. Reasonable and ordinary care must be exercised for the life and health of a prisoner. The City of Rahway is not liable to the plaintiff while in custody for injuries resulting from the plaintiff's own intentional conduct. Absent some special circumstances ... a jailor of the City of Rahway, is under no duty to prevent a prisoner from attempting to take his own life. However, once the .. . jailor[] knows or should have known of the suicidal tendencies of the plaintiff, a duty arises to provide reasonable care necessary to prevent the prisoner from attempting suicide or injuring himself. The duty arises when a prisoner has ... [been] brought into jail, as in a state of helpless intoxication or other circumstances that would place the City of Rahway under the understanding that these represent special circumstances. And obviously, if the special circumstances exist, then the City of Rahway is recognizing that *342 their duty of care increases [with] the risk of harm, they have to exercise a greater degree of care. Without your finding that special circumstances exist, the City of Rahway cannot be held liable for the intentional acts of the plaintiff in attempting suicide.
Plaintiff's counsel requested during the charge conference an instruction which referred to intoxication rather than helpless intoxication and a reference to a prior suicide threat as special circumstances. The trial judge declined these requests at the charge conference and in response to plaintiff's timely objection after delivery of the charge.
A trial judge is obliged to give a comprehensible explanation of the questions that the jury must resolve and apprise them of the law applicable to the issues in the case. State v. Green, 86 N.J. 281, 287-88, 430 A.2d 914 (1981). The trial judge is also obliged to relate the law to the facts of the case. On appeal, this court reviews the charge as a whole. State v. Wilbely, 63 N.J. 420, 422, 307 A.2d 608 (1973). Since an improper jury instruction is a poor candidate for application of the harmless error rule, State v. Simon, 79 N.J. 191, 206, 398 A.2d 861 (1979), a charge which misleads a jury will require a reversal and a new trial. Ellis v. Caprice, 96 N.J. Super. 539, 546, 233 A.2d 654 (App.Div.), certif. denied, 50 N.J. 409, 235 A.2d 901 (1967).
In Hake v. Manchester Township, 98 N.J. 302, 318, 486 A.2d 836 (1985), the Court observed that "`special circumstances' form the basis of most decisions involving a jailer's liability for a prisoner's acts of self-destruction." In Hake, the plaintiff's son hanged himself while detained in a cell at the police station. Id. at 308, 486 A.2d 836. The young man had been drinking and was arrested for driving while intoxicated. Id. at 306, 486 A.2d 836. He was placed in a detention area while a detective called the boy's father. Id. at 307, 486 A.2d 836. The boy was informed that he would be released to his father's custody but had to return to the police station two days later to continue an investigation into the boy's suspected involvement in the theft of a truck earlier in the day. Ibid. Approximately one hour and fifteen minutes later, the boy was found slumped on the floor with his belt around *343 his neck secured to the cell bars. Id. at 308, 486 A.2d 836. The Court noted that the influence of alcohol or depression induced by his arrest close to the Christmas holiday constituted special circumstances requiring heightened scrutiny of the boy. Id. at 318, 486 A.2d 836.
Hake referred to cases in other jurisdictions which seem to require the detainee to be profoundly or helplessly intoxicated before the detainee's intoxication constitutes a special circumstance. See Pretty on Top v. City of Hardin, 182 Mont. 311, 597 P.2d 58 (1979) (summary judgment properly granted because intoxicated detainee who was coherent and did not stagger was not helplessly intoxicated); Lucas v. City of Long Beach, 60 Cal. App.3d 341, 131 Cal. Rptr. 470 (1976) (no evidential foundation for jury's verdict that detainee's death was due to jailer's negligence because there was no evidence that he was in need of medical attention); see also Jane M. Draper, Annotation, Civil Liability of Prison or Jail Authorities for Self-Inflicted Injury or Death of Prisoner, 79 A.L.R.3d 1210 (1977). The Hake Court, however, does not appear to require such a profound level of intoxication before a jury may consider whether special circumstances exist to trigger heightened scrutiny and whether a suicide is foreseeable. Notably, Robert Hake's blood alcohol level was 0.12% at the time of his arrest. Hake, supra, 98 N.J. at 306, 486 A.2d 836. Thus, to limit the jury's consideration of the existence of special circumstances to a detainee in a state of "helpless" intoxication does not appear to accurately state the law in this state.
Furthermore, we are not sure how helpless intoxication has any relevance to a jailer's standard of conduct in the context of a detainee's suicide. We can envision that condition having some relevance if the prisoner vomited and due to his helpless state choked on his own vomit. However, suicide requires actions such as disrobing, fashioning a noose and securing the noose to a stationary object. We are at a loss as to how a person who is so *344 profoundly intoxicated that he is considered helpless can be considered at risk for such a coordinated series of actions.
Of equal significance, the trial judge's limitation of special circumstances to helpless intoxication ignored other factors in this case. It was not enough to advise plaintiff's counsel that he could argue to the jury that plaintiff had uttered an earlier suicide threat and that could be considered in their assessment of the City's conduct. Plaintiff's mental state and threats of suicide are relevant to the jury's consideration of the existence of special circumstances.
We do not mean to minimize the difficulty faced by the substituted judge. At the time he entered the case, there had been seven full trial days and the only testimony which remained to be presented was the videotaped deposition of Dr. Brick and the brief testimony of James Murphy. Then the new trial judge was obliged to charge the jury. Under the circumstances, this was a daunting task. The trial judge readily admitted during the charge conference that he was unfamiliar with the testimony and could not specifically relate the law to the evidence presented at trial. This inability precluded him from adequately instructing the jury. By limiting his instruction to "helpless intoxication," the trial judge may have led the jury to believe that special circumstances exist only in the event of helpless intoxication. Due to the probability that this instruction may have misled the jury, plaintiff is entitled to a new trial on this issue.

II
Since this matter must be retried, we address three issues which may arise in the next trial. If plaintiff continues to pursue the claim that defendants were negligent for failing to train the officers properly in suicide prevention, the trial judge should expressly refer to the claim in the charge. This claim was pressed by plaintiff, both parties discussed the evidence as it related to this claim in their summations, and the judge directed the jury to consider the evidence presented from experts regarding national *345 standards for suicide prevention. However, he never expressly outlined for the jury that one of plaintiff's negligence claims was the failure to properly train the officers.
Dr. Brick should also be allowed to testify regarding the existence of a relationship between intoxication and suicide. The trial judge concluded that Dr. Brick lacked the requisite expertise to form an opinion on that relationship and that the foundation of the opinion was unsound. We disagree. Dr. Brick, a biological psychologist, has extensive academic and practical experience in the field having served as a faculty member at the highly regarded Rutgers Center for Alcohol Studies for fourteen years as of the time of trial. We agree that Dr. Brick had no ability to predict the occurrence of suicide by an individual intoxicated person. However, that was not the purpose of his testimony. Dr. Brick never sought to quantify the risk of suicide or offer a prediction that plaintiff would attempt to commit suicide. Dr. Brick was submitted solely to inform the jury that various studies have found suicide one of the behavioral risks associated with intoxication and that he informs law enforcement officers of that risk in the course of his participation in various police training courses. The information that self-destructive behavior is one of the behavioral risks associated with intoxication, without any quantification of that risk and without any prediction as to plaintiff's behavior, should not have been excluded.
Finally, the trial judge should have issued a limiting instruction in response to defendants' summation which urged that the municipal defendants should not be liable for plaintiff's deliberate act. The trial judge properly rejected defendants' request to charge plaintiff's comparative negligence. Cowan v. Doering, 111 N.J. 451, 468, 545 A.2d 159 (1988). Having declined to place plaintiff's negligence before the jury, the limiting instruction should have been delivered to assure that the jury properly focused on only the relevant issues.

*346 III
In Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146 (1995), a new standard for addressing summary judgment motions was announced. Although the motion judge may evaluate the evidence offered by the proponent and opponent of the motion, that evaluation occurs in the context of the elements of the cause of action and the evidentiary standard. Id. at 533-34, 666 A.2d 146. By any standard, summary judgment should not have been granted as to the negligence claims against Jackson and the municipal defendants on a respondeat superior theory. The negligence claim against Jackson was predicated on his failure to communicate that he had been informed at the scene of the domestic violence incident that plaintiff had threatened to kill himself, as well as his girlfriend.
The motion judge clearly recognized the conflict in the Delgado and Jackson certifications regarding when Jackson was told that Vallejo had threatened to kill himself. Moreover, in the section of the arrest report reserved for "reason for bail," Jackson wrote: "domestic violence, [plaintiff] is intoxicated, violent, and a danger to himself and others." This dispute concerning when Jackson was told by Delgado of plaintiff's threat to kill himself raised a genuine issue of material fact not only as to Jackson's negligence but also as to whether such negligence was a proximate cause of plaintiff's injuries. The record reveals that plaintiff was observed in fifteen minute intervals consistent with the department's suicide watch protocol. However, plaintiff's clothing was not removed as required by the protocol and he hanged himself with his shirt.
The order dismissing the negligence claims against Jackson for failing to report timely plaintiff's suicide threat to his superiors is reversed. So too, the dismissal of the negligence claims on this theory against defendant's municipal employer on a respondeat superior basis must also be reversed and remanded for a new trial.

*347 IV
Plaintiff also argues that the motion judge erred in dismissing his federal civil rights claims against the police department. Plaintiff alleged in his complaint that the department's failure to provide plaintiff needed medical care and its deliberate choice not to train its officers in suicide prevention deprived plaintiff of his federal civil rights.
A federal civil rights claim pursuant to 42 U.S.C.A. § 1983 based on police conduct requires proof of conduct beyond mere negligence. For example, in the context of high-speed police chases which cause injuries, such liability will be imposed only for conduct which shocks the conscience. Fielder v. Stonack, 141 N.J. 101, 134, 661 A.2d 231 (1995); Kollar v. Lozier, 286 N.J. Super. 462, 473, 669 A.2d 845 (App.Div. 1996).
In City of Canton v. Harris, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412, 427 (1989), the Court declared that a municipality may be liable under 42 U.S.C.A. § 1983 (§ 1983) on a "failure to train" theory only where a municipality's failure to train its employees represents a "deliberate choice" to follow a course of action. Important considerations include: whether the training program is adequate; whether any deficiency is the result of a faulty system or policy as opposed to the mere negligent administration of a program; and the extent to which the deficiency is "closely related to the ultimate injury." Id. at 390-91, 109 S.Ct. at 1206, 103 L.Ed.2d at 427-28. The fact that the officers committed a mistake, or the fact that they could have been better trained, will not result in liability under § 1983. Id. at 391, 109 S.Ct. at 1206, 103 L.Ed.2d at 428. The Court indicated that the "deliberate indifference" standard effectively equates with a test of whether the need for particular training was "so obvious" that a municipality's failure to provide it can be fairly considered a policy decision. Id. at 390, 109 S.Ct. at 1205, 103 L.Ed.2d at 427. A "policy" exists where decisionmakers have deliberately chosen *348 to follow a particular course. Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452, 465 (1986).
With specific regard to intoxicated and potentially suicidal detainees, the United States Court of Appeals for the Third Circuit has held that to establish a § 1983 action against a municipality for maintaining a policy or custom of deliberate indifference
plaintiff must have shown that the officials determined by the [court] to be the responsible policymakers were aware of the number of suicides in [municipal] lockups and of the alternatives for preventing them, but either deliberately chose not to pursue these alternatives or acquiesced in a long-standing policy or custom of inaction in this regard.
[Simmons v. City of Philadelphia, 947 F.2d 1042, 1064 (3d Cir.1991), cert. denied, 503 U.S. 985, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992).]
When measured against this standard, the order dismissing the federal civil rights claim against the municipality was properly granted. In support of his claim, plaintiff argues that defendant's conduct exhibited a continual pattern of non-compliance with department policy and the New Jersey Administrative Code. Yet, the record before the motion judge revealed that plaintiff, although not subject to a suicide watch, was checked every fifteen minutes as required by the department suicide protocol. Moreover, the monitoring systems of the cells complied with applicable regulations. N.J.A.C. 10A:34-2.11. Although plaintiff asserts that he should have been medically examined because he was intoxicated, plaintiff failed to point to any regulation requiring such an examination and failed to show how that omission caused his injuries. In short, the record before the motion judge revealed that the municipal defendant was aware of the risk of suicide by detainees and had adopted a surveillance system commensurate with the risk. The record also demonstrated that at most this was a case of negligence, certainly not a case of deliberate indifference.
Affirmed in part; reversed in part and remanded for a new trial consistent with this opinion.