694 A.2d 575

JOHN MYRLAK, PLAINTIFF–RESPONDENT/CROSS–APPELLANT,
v. PORT AUTHORITY OF NEW YORK AND NEW JERSEY AND
PORT AUTHORITY TRANS–HUDSON CORPORATION, DEFEN-
DANTS-APPELLANTS, AND GIRSBERGER INDUSTRIES,
INC., DEFENDANT–RESPONDENT/CROSS–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 29, 1997—Argued March
12, 1997—Decided May 23, 1997.

1

Before Judges SHEBELL, PAUL G. LEVY and BRAITHWAITE.

*Ernest Blair* and *Donald F. Burke* argued the cause for appellants Port Authority of New York and New Jersey and Port Authority Trans–Hudson Corporation (*Hugh H. Welsh,* attorney; *Mr. Blair,* on the brief).

*Michelle Wall* argued the cause for respondent/cross-respondent Girsberger Industries, Inc. (*Melli & Wright, P.C.,* attorneys; *Ms. Wall,* on the brief).

*David L. Pennington* argued the cause for respondent/cross-appellant John Myrlak (*Pennington & Thompson, P.C.,* attorneys; *Mr. Pennington* and *Sidney S. Liebesman,* on the brief).

The opinion of the court was delivered by

PAUL G. LEVY, J.A.D.

Plaintiff, a very large man, injured his back while seated at his work station when his chair collapsed. He sued his federally regulated employer under the Federal Employer's Liability Act (FELA), alleging negligence in supplying him with an undersized chair that collapsed and caused injuries to his back, and he sued the chair manufacturer, alleging strict liability for producing a defective product that caused his injuries. A jury found the employer 100% negligent and awarded plaintiff $1.5 million; the manufacturer was found not liable. The trial judge denied the employer's motion for a new trial or remittitur, and the employer appeals, claiming the trial judge committed reversible error by admitting and excluding certain evidence. Plaintiff cross-appeals, contending the trial judge erred in not charging the jury that the manufacturer could be found liable pursuant to the doctrine of res ipsa loquitur. We reverse the verdict and remand for a complete new trial.

When plaintiff was injured on July 6, 1991, he was almost 43 years old, six feet six inches tall and weighed approximately 325 pounds. He began working for Port Authority Trans–Hudson Corporation (PATH) in 1976, was promoted throughout the years, and his title in 1991 was assistant trainmaster. As assistant trainmaster, his responsibilities included overseeing the movement and operation of the trains and taking care of whatever problems arose. He usually performed these tasks while seated on a movable desk chair at a semi-circular console, approximately eight feet long and three feet high, at which he observed the train control board and answered telephone and radio communications.

Viewing the trial testimony in a light most favorable to plaintiff, as we must pursuant to *Dolson v. Anastasia,* 55 *N.J.* 2, 5, 258 *A.*2d 706, (1969), when reviewing the status of a non-moving party, the pertinent facts are as follows. On July 6, 1991, plaintiff had been conducting his duties as an assistant trainmaster for approximately one hour and forty five minutes. He was seated in his chair at the console in the Hoban Control Center at Journal Square in

Jersey City. Suddenly, he heard his chair make "a loud noise like a crack," the back of the chair gave way, and he fell backwards, parallel to the floor. As he fell, he grabbed the arms of the chair and pulled himself forward. Several other PATH employees heard a loud noise similar to that of grinding gears, and although they did not see plaintiff fall, they did see the back of the chair, collapsed and parallel to the ground. One co-worker tried to use the chair the next day but found it lacked back support.

The chair, manufactured by Girsberger Industries, Inc., had a high back seat with a triple joint construction that allowed the seat to follow the user's every movement through adjustment of two levers. One lever allowed the user to either put the chair in a free flowing or a locked mode, and the other lever adjusted the height of the chair. The chair also had a tension control underneath the seat which could be regulated to adjust for weight. Although plaintiff was not assigned to a particular chair, a PATH employee had informed him that the chair he was using was the best chair available for his size. No one ever gave him instructions as to how the chair worked. The chair was one of 500 chairs recently purchased by PATH from Girsberger, delivered to PATH on May 1, 1991 and placed in the Control Center about June 1, 1991. Aside from testimony that plaintiff barely fit into the chair, there was no evidence that the chair had been misused, although it had been used briefly by other PATH employees during the few months since it had been delivered.

## I.

Dr. Howard Medoff, a mechanical engineer, reviewed the literature and drawings supplied by Girsberger showing the internal workings of the chair. Prior to trial he twice examined a chair, allegedly the one that collapsed under plaintiff, but he was not allowed to disassemble it or perform a failure analysis or test any of the internal parts; he was only allowed to "operate" the chair by using the various control levers. Doing so, Dr. Medoff found the lever controlling the back of that chair worked erratical-

ly. There were no warnings on that chair regarding any limitations on the size or weight of a user of the chair. However, he was unable to reproduce or replicate the accident as it was described by plaintiff. Since a person could sit on the chair that Dr. Medoff examined, he could not state that it was the very one that collapsed under plaintiff or, if it was that chair, whether it had been altered or modified since the accident.

He offered the opinion that the chair was too small for a man of plaintiff's size, and it was this opinion on which plaintiff based his claim that PATH was negligent in failing to provide a safe workplace. Specifically, Dr. Medoff said:

> I think the chair was too small for somebody Mr. Myrlak's size. Mr. Myrlak is beyond what you would call the ninety-fifth percentile in terms of height and weight, meaning there are not many people from a percentage point of view that are taller or heavier than him, a combination of that, and *I think* this chair for a person of Mr. Myrlak's combination of weight and size was not suitable. (emphasis added).

■ Defendant PATH alleges that this was a net opinion, because Dr. Medoff did not provide a factual foundation for his conclusion that the chair was too small for plaintiff. The basic rule is that "an expert's bare conclusions, unsupported by factual evidence, is inadmissible." *Buckelew v. Grossbard*, 87 *N.J.* 512, 524, 435 *A.*2d 1150 (1981). "When an expert's opinion is merely a bare conclusion unsupported by factual evidence, *i.e.*, a 'net opinion,' it is inadmissible. In essence, the net opinion requires an expert witness to give the why and wherefore of his expert opinion, not just a mere conclusion." *Jimenez v. GNOC, Corp.*, 286 *N.J.Super.* 533, 540, 670 *A.*2d 24 (App.Div.), *certif. denied*, 145 *N.J.* 374, 678 *A.*2d 714 (1996) (citations omitted).

PATH analogizes this case to *Jimenez* where we affirmed the trial court's exclusion of the testimony of an expert witness as a net opinion. *Id.* at 542, 670 *A.*2d 24. That plaintiff was injured on the defendant's escalator, and her expert testified that he could only speculate how the escalator handrail stopped because "escalator handrails do not stop unless there has been improper maintenance." *Id.* at 541, 670 *A.*2d 24. We held:

In offering his opinion [plaintiff's expert] demonstrated no expertise; he merely stated what any lay person without any expert knowledge might guess was a potential cause. His testimony is nothing more than an effort to shift the burden of proof to defendants by suggesting that the mere fact of an incident is indicative of [defendant's] negligence. Therefore, his testimony is mere net opinion properly stricken by the trial judge.

[*Id.* at 543, 670 A.2d 24.]

"Expert testimony should not be received if it appears the witness is not in possession of such facts as will enable him to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture." *Dawson v. Bunker Hill Plaza Assoc.*, 289 *N.J.Super.* 309, 323, 673 *A.2d* 847 (App.Div.), *certif. denied*, 146 *N.J.* 569, 683 *A.2d* 1164 (1996) (citing *Vuocolo v. Diamond Shamrock Chem. Co.*, 240 *N.J.Super.* 289, 292, 573 *A.2d* 196 (App.Div.), *certif. denied*, 122 N.J. 333, 585 A.2d 349 (1990)). Supporting data and facts are vital to an expert's opinion "when the opinion is seeking to establish a cause and effect relationship." *Rubanick v. Witco Chem. Corp.*, 242 *N.J.Super.* 36, 49, 576 *A.2d* 4 (App.Div.1990).

When plaintiff sat in the chair produced for pretrial discovery, Dr. Medoff observed "there was not a lot of room in between Mr. Myrlak's body and the sides of the chair." The statistical basis for Dr. Medoff's opinion of plaintiff's size ("there are not many people from a percentage point of view that are taller or heavier than him") was not challenged at trial. However, his bare conclusion that the chair was not suitable is only a net opinion because it does not "give the why and wherefore" of his opinion. *Jimenez, supra*, 286 *N.J.Super.* at 540, 670 *A.2d* 24. That opinion may have been the basis for the jury's verdict holding PATH liable and therefore reversal as to PATH is required.

## II.

Additionally, the trial judge erred in rejecting certain opinion evidence from Stan Johnson, Girsberger's plant manager. It was proffered that he would testify as to "what would have had to have broken for [plaintiff's version of the accident] to have happened," and if the chair had broken as described by plaintiff,

whether it could then be placed in an upright position without any repairs. It is clear that Johnson knew how the Girsberger chairs were manufactured, how they operated and how they were tested at the plant before being shipped to dealers. His familiarity with the process and the product were sufficient to permit his opinion testimony as a lay witness or even as an expert witness if he had been offered as such under suitable disclosure to plaintiff. It cannot be said without qualification that fact witnesses cannot give opinion testimony. *See* Biunno, *New Jersey Rules of Evidence,* comment 1 on *N.J.R.E.* 701 at 669 (1996). A lay witness may offer an opinion "if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." *N.J.R.E.* 701. We have previously noted that "a claim of defective products furnishes support for the proposition that the testimony of knowledgeable employees is properly admissible," and exclusion of such testimony may be an abuse of discretion. *Navarro v. George Koch & Sons, Inc.,* 211 *N.J.Super.* 558, 583, 512 *A.*2d 507 (App.Div.), *certif. denied,* 107 *N.J.* 48, 526 *A.*2d 138 (1986). Johnson could have revealed Girsberger's standards, that is, the manufactured capability of the chair. PATH was prejudiced by the exclusion of this evidence which may have contested Dr. Medoff's net opinion, and plaintiff was prejudiced because its exclusion prevented him from proving a manufacturing defect, as we discuss in *III., infra.*

Johnson's direct knowledge, however, was somewhat limited. He oversaw the manufacture of the chairs and was aware of the type of testing in the plant. Testing for load capacity of the seat and back of the chairs and compliance with ANSI standards was performed by an independent testing company. When Johnson proffered the ANSI standard test results, done by an independent testing laboratory for Girsberger, the judge disallowed the testimony. We presume the test results were sent to Girsberger in writing. On retrial, if the persons who did the testing are not available, the judge may explore whether that report would be admissible as a record of regularly conducted activity pursuant to *N.J.R.E.* 803(c)(6). The test results expressed in the report might

also be admissible as expert opinion included in an admissible hearsay statement. *N.J.R.E.* 808. Load testing, strength testing and durability testing were apparently revealed in the report from the independent testing company. Whether the reports are admissible will depend on the foundation established at trial. *See State v. Matulewicz,* 101 *N.J.* 27, 30, 499 *A.*2d 1363 (1985).

While control over evidence rulings is for the most part discretionary, we conclude the admission of Dr. Medoff's net opinion and the exclusion of Mr. Johnson's opinion testimony were each a mistaken exercise of discretion requiring reversal. If there is a retrial, and similar evidence is proffered, the trial judge should be guided accordingly.

### III.

■ The exclusion of Johnson's proffered testimony also affects plaintiff's cross-appeal, in which he contends the judge should have instructed the jury that proof of Girsberger's liability for a defect in the chair could be found by application of the doctrine of res ipsa loquitur. Defendant Girsberger posits that the enactment of the Product Liability Act in 1987 (*N.J.S.A.* 2A:58C–1 to –7) preempted all causes of action against manufacturers, and res ipsa loquitur is no longer recognized in products liability cases.

The Product Liability Act is basically the common law of strict liability. Three distinct strict liability types of action have developed in the case law: those alleging manufacturing defect, design defect and warning defect. Dreier, Goldman & Katz, *N.J. Products Liability & Toxic Torts Law* § 8:1 at 96 (1996). Manufacturing defects are "deviations from the manufacturer's intention which cause a product to be dangerous." *Id.* § 8:2–2 at 97. Here we are concerned with an alleged manufacturing defect.

■ A classic manufacturing defect case may be proved without proof of the specific defect in the product by satisfying *N.J.S.A.* 2A:58C–2, which provides in pertinent part:

A manufacturer ... shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was

not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications ... or performance standards of the manufacturer. . . .

While those proofs will suffice to demonstrate a defect existed, a plaintiff must also prove the defect was under the manufacturer's control and existed when the product was distributed, and the defect caused injury to someone reasonably expected to use the product. *Suter v. San Angelo Foundry & Machine Co.*, 81 *N.J.* 150, 169, 406 *A.2d* 140 (1979). Although the mere occurrence of an accident is not enough to prove a product was not fit for ordinary purposes, additional circumstantial evidence may establish that something was wrong with the product. *See Moraca v. Ford Motor Co.*, 66 *N.J.* 454, 458–60, 332 *A.2d* 599 (1975); *Scanlon v. General Motors Corp.*, 65 *N.J.* 582, 598, 326 *A.2d* 673 (1974).

Res ipsa loquitur is neither a cause of action nor a theory of liability; it is a method of circumstantially proving that a product was defective. The plaintiff need not prove a specific manufacturer's defect, but if the proofs support an inference that the accident was caused by a defect, whether identifiable or not, there is a liability question for the jury to resolve. *Moraca v. Ford Motor Co.*, 66 *N.J.* 454, 458, 332 *A.2d* 599 (1975). Res ipsa loquitur, applied here, would be an alternative way to permit the jury to infer that the manufacturer was negligent in producing the chair if the jury decided that the collapse of the chair ordinarily would signify negligence, the chair was within Girsberger's exclusive control while being made, and there was no indication that the incident resulted from plaintiff's negligence. *See Maciag v. Strato Medical Corp.*, 274 *N.J.Super.* 447, 460, 644 *A.2d* 647 (App.Div.1994)(quoting *Kahalili v. Rosecliff Realty, Inc.*, 26 *N.J.* 595, 606, 141 *A.2d* 301 (1958)). *Maciag* illustrates the continued viability of res ipsa loquitur in product liability cases.

Under both methods of proof, res ipsa loquitur and the usual proof of a defect under *N.J.S.A.* 2A:58C–2, plaintiff must prove he did not improperly handle the chair, that the chair's condition did not change after Girsberger put it into the stream of commerce and it reached plaintiff, and that the defective chair was a proxi-

mate cause of plaintiff's injuries. *Ibid.; Suter, supra,* 81 *N.J.* at 169, 406 *A.*2d 140.

Dr. Medoff testified that the sudden "structural failure" of the chair resulting in plaintiff being thrown backwards over the collapsed back of the chair "could [have been] a combination of force that he applied and a defect in the chair." While he could not identify what was wrong with the chair he had been shown, because he was refused the chance to do a failure analysis or to disassemble it, he insisted "[s]omething wasn't right in the chair and something broke." However, by excluding Johnson's testimony of Girsberger's standards, if any, concerning the load the chair was made to hold, the judge eliminated a factual source that was crucial to the plaintiff's ability to meet the burden of proving a defect.

It is unusual to be able to prove a production defect by direct evidence, but circumstantial evidence is certainly satisfactory. Here all the witnesses heard the sound of grinding gears before the chair collapsed, and they also observed that afterwards, the back of the chair had fallen to a horizontal position. There was evidence that plaintiff had not misused the chair. The jury was instructed to consider those circumstances and determine whether the chair's collapse was due to some defect, but without any information about whether the chair was made to accommodate ordinary usage by a person of plaintiff's size. Despite that void, the judge told the jury that plaintiff had the burden of proving "this chair deviated from defendant Girsberger's standards, that there was a defect in the chair and that it failed to perform as designed. Plaintiff need not prove that the defendant actually knew of the defect when it produced the chair or when the chair left its control."

By requiring proof of a deviation from the manufacturer's standards, after the proffered evidence thereof had been excluded, the jury could not fairly evaluate the claim of manufacturing defect. This left a situation where the collapse of the chair indicates there was negligence by either the manufacturer or the

supplier (PATH as employer), the chair was in Girsberger's control during the manufacturing process, and there was evidence the chair had not been misused. By refusing to instruct the jury how it could infer Girsberger was negligent, by applying the doctrine of res ipsa loquitur, the judge denied plaintiff a fair chance to recover from Girsberger.

Accordingly, plaintiff and PATH were prejudiced by this error in the jury charge. By finding Girsberger not liable, the jury may simply have decided there was insufficient proof of Girsberger's standards and not found the need to consider whether it could infer there was a manufacturing defect. Accordingly, the verdict in favor of Girsberger must be reversed.

### IV.

The jury awarded plaintiff damages of $1.5 million. PATH contends the award was based to a great extent on considerations of past and future loss of earnings that were improperly based on evidence of gross rather than net earnings. In response, plaintiff says the expert's testimony, the judge's charge and the jury's verdict belie that contention. Our review of the testimony describing plaintiff's injuries and his potential economic losses leads us to conclude that the jury was confused by the economist and, as well, by the court's instructions on how that evidence should be considered.

Two orthopedic surgeons examined plaintiff after the incident. They diagnosed a herniated (ruptured) disk in his lumbar spine, radiculopathy (disease of the spinal roots), carpal tunnel syndrome (pain and numbness in the hand) and other related infirmities. One doctor opined that without surgery, plaintiff would not be able to return to work, because plaintiff was 65% disabled in every day life and 100% disabled as to employment.

Plaintiff testified that his base pay was approximately $1,100 each week, and with overtime pay, close to $70,000 gross per year. Because he often worked overtime, his earnings fluctuated each year. However, his actual wages were reflected in his W–2 forms

which indicated the highest he earned in one year was $68,252 gross. PATH removed him from the payroll in February 1992; he has not earned any money since then, and he claims he cannot work due to continued pain.

Andrew Gluck, a vocational economic analyst, testified that plaintiff's lost earnings for the four years since the date of the accident equaled $296,511. He calculated this sum by averaging plaintiff's salary from his 1988–1991 W–2s and adjusting it for the effects of inflation reflected in the consumer price index, bringing it up to 1994 dollars. He did not explain how he made the adjustment, whether it was for inflation only or also included interest. However, plaintiff testified his weekly "take home" pay was between $600 and $700. Based on that, we calculate his maximum net loss, in unadjusted dollars, was $145,600 ($700 × 52 × 4 = $145,600) for the four years between the accident and the trial. Under the FELA, the proper measure of damages in a personal injury matter is net income after taxes. *Norfolk & Western Railway Co. v. Liepelt*, 444 *U.S.* 490, 493, 100 *S.Ct.* 755, 757, 62 L.Ed.2d 689, 693–94 (1980). This is the New Jersey standard as well. *See Caldwell v. Haynes*, 136 *N.J.* 422, 434, 643 *A.*2d 564 (1994).

The record is barren of any explanation of Gluck's naked assertion that plaintiff lost $296,511 in the four years prior to trial. We are concerned that Gluck may have factored in interest for that period, when interest would be calculated by the trial judge, after the verdict, pursuant to *R.* 4:42–11(b). While we cannot know what amount of past lost wages was included in the verdict, we conclude the expert's testimony that may have doubled the net past losses tainted the verdict. Clearly, plaintiff's net four-year past wage loss was significantly less than $296,511. The judge could have cured this by asking a few questions of the witness or giving a brief instruction to the jury. Failure to do so led to a misinformed jury. *See Hudgins v. Serrano*, 186 *N.J.Super.* 465, 481, 453 *A.*2d 218 (App.Div.1982) ("A deviation of as much as 20% might easily be understood and justified. A figure which ap-

proaches 200% is, in our judgment, a disproportion so gross as to constitute a manifest injustice.").

Consideration of future lost wages is not so clearly erroneous, but we conclude the verdict was tainted by the use of base figures from gross rather than net earnings. *Cf., Caldwell, supra,* 136 *N.J.* at 439, 643 *A.*2d 564 ("With respect to future lost wages the verdict obviously was also distorted by evidence that was limited to gross income.").

To determine plaintiff's future lost wages, Gluck applied government statistics to support his opinion that plaintiff's work life expectancy, had he not been injured, was 15.76 years, but due to his injuries, plaintiff's work life expectancy was 11.18 years. He then considered that an average disabled person with one year of college earns about $32,000 per year. Based on an upwardly adjusted annual *gross* earnings amount of $74,702, Gluck calculated that the difference between expected earnings without and with the injuries, reduced to present value, was $984,185. He then added that amount to the lost past wages ($296,511), and added $131,982 for the cost to replace household services; his conclusion was that plaintiff's total economic loss, reduced to present value, was $1,412,679. That amount was stated in the cover letter to the report and in the body of the report, both of which were presented to the jury as exhibit P–38.

Gluck amended his report, during the trial, by performing a "tax analysis" (exhibit P–39) in which he calculated the amount of money it would take each year to replace the earnings plaintiff would have lost had he not been disabled. In doing so he added expected gross wages, interest to be earned on the jury's verdict, twenty percent for fringe benefits, and deducted state and federal income taxes over a *twenty-eight year period* ending on plaintiff's seventy-fourth birthday (based on plaintiff's overall life expectancy). Table 2 in exhibit P–39 contained a column entitled "Replacement Amount Needed" that supposedly recalculated exhibit P–38 "to eliminate the tax." That column totals approximately $1,450,-000.

Throughout Gluck's testimony and report, most references are to gross wage earnings. Even exhibit P–39 begins with an assumed amount of gross earnings needed to replace plaintiff's lost future earnings, and thereafter taxes are deducted. Evidence presented in that manner does not have the capacity to meet a plaintiff's burden of "proving net income when seeking recovery for diminished earning capacity based on lost wages." *Caldwell, supra,* 136 *N.J.* at 436, 643 *A.*2d 564.

In *Caldwell, id.* at 428, 643 *A.*2d 564, the plaintiff, who was injured in a car accident, testified his pre-accident annual gross salary was $44,000 although he estimated that his gross wages for the previous year were only "twenty something" thousand. When the jury awarded plaintiff $200,000 for past lost wages, $1.5 million for future lost wages, and $250,000 for pain and suffering, the trial judge ordered a new trial on damages. *Id.* at 429, 643 *A.*2d 564. The judge determined that in addition to the improper past lost wages calculation, the future lost wages was flawed because "the jury would have to have used gross income and to have concluded that plaintiff would work steadily without a break until reaching eighty-years of age." *Id.* at 430, 643 *A.*2d 564. The Supreme Court agreed a new trial was necessary because:

> [d]espite the absence of evidence of plaintiff's net income, the trial court instructed the jury to use net income as the measure of lost wages. Nevertheless, the jury seemingly did not attempt to ascertain or apply net income in its calculations as a matter of common sense and ordinary experience even in the absence of evidence of net income.

> [*Id.* at 435, 643 *A.*2d 564.]

It is also apparent that admission of Gluck's work product into evidence was improper. While Gluck did not verbalize the calculated total loss, his report was submitted to the jury and the total loss was prominently displayed therein. This was erroneous and so obviously prejudicial as to constitute plain error. *R.* 2:10–2. "The projection of a gross figure before the jury submitted by an expert tends to exert an undue psychological impact leading to the danger of its uncritical acceptance by the jury in the place of its own function in evaluating the proofs." *Tenore v. Nu Car*

*Carriers, Inc.*, 67 *N.J.* 466, 482–83, 341 *A.*2d 613 (1975). More pointedly, we have previously held that evidence such as exhibits P–38 and P–39 constituting "the expert's opinion of the present value of future earnings after enhancement and deductions determined reasonable by the expert" are inadmissible. *Dunn v. Praiss*, 256 *N.J.Super.* 180, 199, 606 *A.*2d 862 (App.Div.1992), certif. denied, 130 *N.J.* 20, 611 *A.*2d 657 (1992).

Furthermore, the calculations in exhibits P–38 and P–39 for a period of twenty-eight years was clearly capable of confusing the jury because there was no reasonable explanation of how the work life expectancy and the overall life expectancy interrelated for purposes of calculating future wage losses. The emphasis on gross earnings in Gluck's report and testimony lead us to conclude it unlikely that net earnings were properly considered by the jury.

In addition to problematic evidence of lost past wages and inadmissible evidence of the economic expert's calculations and opinions, the jury charge was insufficient. Summations by each counsel were more cryptic than illuminating when it came to making a point concerning economic losses as damages. The trial judge could have used the model charge to explain the issues, especially regarding net pay and past lost earnings, and work life expectancy, net earnings, present value and the effects of inflation and taxation regarding future lost earnings. *See Model Jury Charges–Civil* § 6.11(D). Classically, "discount[ing] [a recovery] to present value [is] a procedure which recognizes that the [injured party] would have had his income spread out over the remaining years of his working life." *Tenore, supra*, 67 *N.J.* at 474, 341 *A.*2d 613. Instead, after stating that plaintiff's life expectancy was 31.39 years, but not explaining the implications of his work life expectancy, the judge gave the following limited explanation of damages:

> In fixing the amount of damages for loss of earnings, you should take into consideration the period of time during which he wasn't employed, his average net or after taxes earnings before the accident, his earning capacity before and after the injury, any special skills he may have had, the availability of employment suitable for him, if the injury did not occur. All these factors would be relevant in

your determination of the amount of damages to be awarded. And again, that's to be included in that one lump sum. Loss of earnings from time of injury to present.

In fixing the amount of damage for loss of future earnings, if you determine such loss would probably occur, you should take all the factors I just mentioned into consideration. Also consider his work life expectancy before the injury and the amount he can earn in such employment that will be available to him in the future and which you determine he would be physically capable of undertaking.

You should know and I believe everyone's stated and there's no dispute about it obviously that any return that you give the plaintiff is not subject to federal income taxes so you have to calculate that in as well, that this money would not be taxed.

And also counsel mentioned that the amount could be invested to yield income in the future, so you have to adjust for that as well.

With these limited instructions, and with the expert's two reports in evidence and in the jury room, the jury was sent off to deliberate. "A trial judge is obliged to give a comprehensible explanation of the questions that the jury must resolve and apprize them of the law applicable to the issues in the case." *Vallejo by Morales v. Rahway Police Dep't.*, 292 *N.J.Super.* 333, 342, 678 *A.*2d 1135 (App.Div.), *certif. denied,* 147 *N.J.* 262, 686 *A.*2d 763 (1996). "The trial judge is also obliged to relate the law to the facts of the case, . . . . [and] a charge which misleads a jury will require a reversal and a new trial." *Ibid.; see also Jefferson v. Freeman,* 296 *N.J.Super.* 54, 65, 685 *A.*2d 1357 (App.Div.1996).

In this case, the judge's instructions were misleading, because they did not explain what was meant by "calculating" the fact that any damages award is not subject to federal income taxes or what was meant by the direction to the jury "to adjust" for plaintiff's ability to invest the amount awarded as damages "to yield income in the future." Gluck was not clear on these points and the jury charge was enigmatic. We conclude, therefore, that the charge did not set forth the law in a clear and complete way. "The jury could only have been confused or misled by what had transpired." *Navarro, supra,* 211 *N.J.Super.* at 580, 512 *A.*2d 507.

On the appeal and cross-appeal, we reverse and remand for a new trial on all issues.