**CSX TRANSPORTATION, INC.,**
Appellant/Cross–Appellee,

v.

**Troy MOODY, Appellee/Cross–Appellant.**

Nos. 2007–SC–000548–DG,
2009–SC–000048–DG.

Supreme Court of Kentucky.

May 20, 2010.

Raymond G. Smith, Edward H. Stopher, David T. Klapheke, Boehl, Stopher & Graves, LLP, Louisville, KY, Dan Himmelfarb, Mayer Brown, LLP, Washington, DC, Counsel for Appellant/Cross–Appellee, CSX Transportation, Inc.

Kenneth L. Sales, Joseph Donald Satterley, Paul Jason Kelley, Sales, Tillman, Wallbaum, Catlett & Satterley, Louisville, KY, Counsel for Appellee/Cross–Appellant, Troy Moody.

## OPINION OF THE COURT

This appeal concerns an action filed by Troy Moody under the Federal Employers' Liability Act (FELA).[1] Moody claimed that he developed a type of permanent brain injury known as toxic encephalopathy from exposure to fumes from solvents used in his work for CSX Transportation, Inc. in the 1970s and 1980s. A jury returned a verdict in his favor and awarded damages, after which CSX appealed. The Court of Appeals vacated the award of future medical expenses, holding that the amount of the award was supported only by supposition and speculation, but affirmed in all other respects.

We granted CSX's motion for discretionary review to consider whether the Court of Appeals erred by affirming the trial court's decision to admit evidence concerning other employees' exposure to solvents as well as its refusal to give instructions that CSX tendered concerning the foreseeability of harm, non-taxability of damages, and reduction of damages to present value. We granted Moody's cross-motion to consider whether the Court of Appeals erred

by holding that CSX filed a timely notice of appeal.

Moody began to work at CSX's South Louisville shops in August 1978 as a service attendant and later worked as a machinist helper and machinist apprentice. His duties included cleaning pits, ramps, tools, and anything else that required cleaning, often in confined spaces. He stated that he used various cleaning solvents, including brown soap, mineral spirits, and a substance that he referred to as "Dowclene."[2]

Although Moody received a protective rubber apron, hard hat, safety goggles, and face shield, he stated that he was neither given a respirator nor informed of the dangers involved in using solvents. He testified that Dowclene emitted particularly strong-smelling fumes that resembled gasoline. He used the chemicals daily and frequently became lightheaded, dizzy, and nauseated. He would go outside for a "fresh air break" until his symptoms subsided but did not report the symptoms to a nurse or physician. Moody was furloughed from December 12, 1982, until July 28, 1983, after which he returned to work at the shop. At that time, he used brown soap and mineral spirits but not Dowclene. Moody was transferred to work on a rail gang sometime in 1984 and worked repairing machinery. He quit working in 2002 after he developed carpal tunnel syndrome.

Moody's claim alleged that CSX knew or should have known of the dangers associated with using Dowclene but failed to take necessary safety precautions, which

---

1. 45 U.S.C.A. §§ 51–60.

2. The parties refer at various times to "Dow Clean," "Dow Cleaner," "Dowclene," and "DowClene." "DowClene," manufactured by Dow Chemical, consists of a mixture of tri-

chloroethane and perchloroethylene (PERC). CSX records, OSHA inspection records, and Jefferson County Pollution Control records also indicate that workers used pure 1, 1, 1 trichloroethane at the South Louisville shops.

caused him to be exposed to toxic fumes and develop toxic encephalopathy. The injury produced memory loss, confusion, anxiety, mood swings, and fatigue, which Moody alleged were permanent and disabling.

Moody's evidence included testimony from Dr. Douglas Linz, a specialist in internal, occupational, and environmental medicine. Dr. Linz testified concerning the long-term effects of using volatile chlorinated organic solvents such as PERC and trichloroethane and mineral spirits. He stated that symptoms of toxic encephalopathy generally require three to ten years' exposure but can develop with as little as three months' exposure. The occupational history he obtained from Moody indicated that he and nearby workers used large quantities of the solvents in poorly-ventilated areas, including pits. Dr. Linz stated that fumes from such chemicals are heavier than air, which causes them to collect in areas such as pits, increasing the intensity of an exposure when working in such an area. He opined that Moody suffered from permanent brain damage due to toxic encephalopathy and that the condition resulted from exposure to solvents in his work for CSX.

CSX made two motions for a directed verdict, the first after Moody rested his case and the second after CSX rested its case. The trial court denied both. The jury then returned a verdict in Moody's favor and awarded damages of $200,000.00 for future medical expenses; $540,000 for future lost wages; $1,000,000.00 for past pain and suffering; and $1,000,000.00 each for future pain and suffering.

## I. Timely Appeal

The parties disagreed when arguing CSX's directed verdict motion about proof of Moody's after-tax wages and about whether a collective bargaining agreement permitted CSX to offset certain medical expenses. The trial court denied the motion, noting that the issues could be resolved after the jury returned its verdict but before judgment was entered, by means of post-trial briefs and additional proof if required. The disagreement arose again when discussing jury instructions concerning damages, at which time the parties agreed to brief the issues as suggested earlier by the court.

CSX made an oral motion for judgment notwithstanding the verdict (JNOV) immediately after the jury returned a verdict, raising four issues. The trial court denied the motion to vacate as to negligence and the sufficiency of evidence that disability from the injury caused Moody's wage loss. Consistent with the parties' agreement, the court deferred a ruling and designated the time within which the parties should brief whether damages for wage loss must be based on after-tax earnings and whether CSX was entitled to offset future medical expenses paid under its medical plan.

CSX filed its brief, albeit styled as a motion for JNOV, on October 10, 2003 and Moody filed a brief in response. The trial court determined after a hearing that the record contained ample proof to support the verdict and denied the balance of the oral motion on November 21, 2003. A subsequent order struck "final and appealable" language from the November 21 order.

The trial court entered judgment on the jury's verdict on December 18, 2003. On Monday, December 29, 2003 CSX filed a motion for JNOV or, in the alternative, a new trial, which included both the issues raised in the oral motion and new issues. Although the trial court denied the motion for JNOV on December 28, 2004, the order failed to address the new trial request. CSX requested a ruling on the request on January 6, 2005, after which the trial court

entered an order acknowledging that it remained pending. The court entered an order denying a new trial on June 27, 2005 and CSX filed a notice of appeal on July 14, 2005. Although Moody moved to dismiss, the Court of Appeals denied the motion and affirmed the trial court.

■ Moody's cross-appeal asserts that the Court of Appeals erred by failing to grant his motion to dismiss CSX's appeal as untimely. He argues that CR 59.02 and the first sentence of CR 50.02 permit a motion for JNOV and/or a new trial to be made at any time after the jury returns a verdict but within 10 days after the entry of judgment. Moreover, they permit the motion to be made orally, immediately after the jury renders its verdict, or filed in writing no later than 10 days after judgment is entered. He concludes that CSX moved for JNOV or, in the alternative, a new trial before judgment was entered.[3] Moody maintains, therefore, that CSX's post-judgment motion for JNOV or a new trial amounted to a motion to reconsider the denial of the initial motion, which did not toll the time for filing a notice of appeal. We disagree.

Although CR 73.02(1)(a) requires a notice of appeal to be filed within 30 days after the notation of "service of the judgment or order" being appealed, CR 73.02(1)(e) terminates the running of the time for appeal upon the filing of a timely motion for JNOV or a new trial. The time commences to run when an order granting or denying the motion is served under CR 77.04(2).

CR 50.02, which authorizes a motion for JNOV, provides:

Not later than 10 days after entry of judgment, a party who has moved for a directed verdict at the close of all the evidence may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned, such party within 10 days after the jury has been discharged may move for judgment in accordance with his motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. *If a verdict was returned the court may allow the judgment to stand or may reopen the judgment* and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial. (emphasis added).

CR 59.02 provides:

A motion for a new trial shall be served not later than 10 days after the entry of the judgment.

■ The term "judgment notwithstanding the verdict" may be construed to include an initial judgment that disregards the jury's verdict. The third sentence of CR 50.02 states specifically, however, that a trial court when ruling on a motion for JNOV and/or a new trial may either "allow the judgment to stand" or "reopen the judgment," either of which presumes that a judgment has been entered. In other words, CR 50.02 authorizes motions that request the court to reconsider and reopen an existing judgment.

We do not view the oral motion made at the close of trial or the brief filed in support of the oral motion as being premature

---

**3.** The prayer for relief in CSX's brief made an alternative request for a new trial on the issue of damages.

motions for JNOV and/or a new trial.[4] Unlike the situation in *Cloverleaf Dairy v. Michels*,[5] CSX filed only one motion to reconsider a judgment. The motion tolled the time for taking an appeal until 30 days after the notation of service of the order denying the motion for a new trial. CSX's notice of appeal was timely because it was filed within the 30–day period.

## II. The Federal Employers' Liability Act

■ The Federal Employers' Liability Act ("FELA")[6] provides a uniform method for compensating injured railroad workers and their survivors.[7] It is remedial legislation and is to be construed liberally in order to accomplish its humanitarian purpose.[8] The FELA authorizes a federal cause of action, but Congress gave state and federal courts concurrent jurisdiction over FELA claims.[9] The substantive law that governs a FELA action is federal, whether brought in state or federal court,[10] but the law of the forum governs procedural matters.[11] Forum law governs the admissibility of evidence subject to review for an abuse of discretion.[12] It also governs the form of jury instructions.[13]

## III. Evidence of Similar Exposure to Solvents by Other Workers

*CSX* asserts that the trial court erred by admitting testimony from Martine Ro-Bards, a PhD neuropsychologist,[14] concerning a study that she conducted on railroad workers who were exposed to solvents. Relying on *Burton v. CSX Transportation, Inc.*,[15] CSX complains that Moody failed to meet his burden to demonstrate the substantial similarity of what amounted to evidence of other claims.

4. *See Harrison v. Clark*, 431 S.W.2d 716 (Ky. 1968) (court retained jurisdiction to consider JNOV and new trial motions filed one to two hours before judgment entered where judgment did not consciously rule on them).

5. 636 S.W.2d 894 (Ky.App.1982).

6. 45 U.S.C.A. §§ 51–60.

7. *Brady v. Southern Ry. Co.*, 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943).

8. *Urie v. Thompson*, 337 U.S. 163, 180–81, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949).

9. 45 U.S.C. § 56.

10. *Chicago, M. & St. P. Ry. Co. v. Coogan*, 271 U.S. 472, 46 S.Ct. 564, 70 L.Ed. 1041 (1926).

11. *See Central Vermont R. Co. v. White*, 238 U.S. 507, 511, 35 S.Ct. 865, 59 L.Ed. 1433 (1915).

12. *Norfolk & Western Ry. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980) (whether evidence concerning federal taxes on decedent's earnings was properly excluded is a federal question, but a trial court is not required to permit such evidence where fu-

ture tax impact is *de minimus*); *Lavender v. Kurn*, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946) (admissibility of evidence in FELA action a matter for trial court absent abuse of discretion); *Chesapeake & O. Ry. Co. v. Kelly*, 241 U.S. 485, 491, 36 S.Ct. 630, 60 L.Ed. 1117 (1916) (forum law determines evidence admitted to show method for calculating present value).

13. *See, e.g., Pryor v. National R.R. Passenger Corp.*, 301 Ill.App.3d 628, 234 Ill.Dec. 897, 703 N.E.2d 997, 1000–01 (1998); *Duren v. Union Pacific R. Co.*, 980 S.W.2d 77, 79 (Mo. App.1998).

14. Neuropsychology is "[a] specialty of psychology concerned with the study of the relationship between the brain and behavior, including the use of psychological tests and assessment techniques to diagnose specific cognitive and behavioral deficits and to prescribe rehabilitation strategies for their remediation." STEDMANS MEDICAL DICTIONARY 1314 (28th ed.2006).

15. 269 S.W.3d 1 (Ky.2008). *See also Rye v. Black & Decker Mfg. Co.*, 889 F.2d 100, 102 (6th cir.1989); 31A C.J.S. EVIDENCE 8, 320 (2008).

CSX argues that the evidence prejudiced its case substantially and warrants a new trial because it posed an improper "risk of encouraging the jury to think that if other CSX workers were making the same sort of claims, then [Moody's] ailments must have also been caused by workplace solvent exposure even if there was insufficient proof of his individual exposure and a causal link to his symptoms."[16]

■ Rulings on the admissibility of evidence in a FELA claim are left to the sound discretion of the trial court absent an abuse of discretion.[17] Much of the expert testimony in *Burton* concerned whether the plaintiff's symptoms resulted from toxic encephalopathy due to solvent exposure at CSX or from multiple sclerosis. Having failed to convince the jury that his symptoms resulted from solvent exposure, Burton asserted on appeal that the trial court erred by refusing to permit witnesses to refer to the fact that Dr. RoBards' study linked solvent exposure to brain damage and cognitive impairment in CSX workers.[18]

Dr. Linz testified that Burton's cognitive impairment resulted from his exposure to solvents at CSX. He also testified concerning the findings of numerous studies of "railroad workers" or "those affected by solvents." Burton argued on appeal that Dr. Linz should have been allowed to refer to Dr. RoBards' study subjects as "CSX workers," which would have emphasized that the solvents he used at work could have caused his cognitive impairment.

We affirmed, convinced that the risk of undue prejudice outweighed the evidence's probative value because Burton failed to lay a proper foundation showing that Dr.

RoBards' study subjects worked under conditions substantially similar to his own. We noted that to identify them as "CSX workers" might encourage the jury to conclude that Burton's symptoms resulted from workplace solvent exposure, even if it considered his proof of causation to be weak, because co-workers made similar claims. The present claim differs from *Burton* because Moody laid a proper foundation for the disputed evidence.

### A. John Newell Claim

■ CSX filed a motion in limine to preclude any testimony or reference to solvent claims and exposures of other railroad employees. The motion sought specifically to preclude both a 1978 injury report by John Newell, who claimed to suffer health problems after being exposed to Dow Cleaner, and the 1980 deposition of Tyrone Green in Newell's case. CSX argued at the hearing that Newell's exposure and symptoms were not substantially similar to Moody's. It conceded that it knew acute dizziness and headaches could result from an overexposure to solvents at the time of Moody's exposure but asserted that it did not know an overexposure could cause toxic encephalopathy.

■ Moody asserted that Newell's exposure as a service attendant was substantially similar to his own. He argued that CSX planned to call its industrial hygienist to testify that service attendants were not overexposed to dangerous chemicals and did not require protective measures. Yet, Newell's injury and 1980 lawsuit put CSX on notice that a service attendant became ill from overexposure to dangerous chemicals while working in the South Louisville

16. *Burton,* 269 S.W.3d at 12.

17. *Lavender v. Kurn,* 327 U.S. 645, 654, 66 S.Ct. 740, 90 L.Ed. 916 (1946).

18. Dr. RoBards received a serious injury before the *Burton* trial and was unable to appear and testify.

shops. The trial court denied CSX's motion but warned Moody that he must show a substantial similarity with respect to evidence concerning any other worker or risk a mistrial. The record indicates that the court did not abuse its discretion when admitting the evidence.[19]

Moody offered evidence at trial showing a substantial similarity between his exposure and symptoms and those of Green and Newell. The record indicates that Newell became ill and was treated at the hospital for an overexposure to Dowclene while working as a service attendant at the South Louisville shops in 1978. His symptoms included abdominal pain and vomiting as well as dizziness. Green's 1980 deposition indicated that he and Newell used Dowclene together in the South Louisville shops; that they used Dowclene during the same period and in the same manner as Moody; and that they experienced some of the same symptoms as Moody.

Green testified that he had worked as a service attendant at the South Louisville shops since 1974 and observed Newell experiencing nausea on several occasions when using Dowclene. He stated that Dowclene came in fifty-gallon drums and that he used it often, spraying it with a compressed air tank and hose or pouring it on parts and machinery that he wanted to clean. The chemical irritated his skin and caused him to be nauseated. Like Moody, he took frequent fresh-air breaks to avoid the fumes. Green stated that his symptoms lingered after he stopped using Dowclene; that he was never given any protective equipment; that he complained to his foreman about Dowclene's effects; and

that he knew of no one who inhaled Dowclene who did not complain of symptoms like his own.

## B. Dr. RoBards' Study

█ CSX's motion in limine sought to preclude Dr. RoBards from testifying at trial on the grounds that she was not qualified to testify to causation, Moody's ability to return to work, or whether he was disabled and that her testimony lacked the degree of scientific validity and reliability that *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[20] requires. CSX reasoned that, as a psychologist, Dr. RoBards' lacked the qualification "to opine as to the medical cause organic brain damage—a neurological condition." Thus, her conclusions on the issue "are the product of a flawed methodology, which relates back to [her] lack of qualifications." CSX stated at the hearing on the motion that while it did not object to testimony from Dr. RoBards indicating that testing revealed Moody's condition to be consistent with solvent-induced encephalopathy, she should not be permitted to testify that solvent exposure caused his brain damage because she is not a physician. Moody asserted that Dr. RoBards' findings were relevant to the question of foreseeability and agreed that she would not be asked to testify to causation.

The Court of Appeals rejected CSX's *Daubert* challenge, noting that its argument appeared to concern the sufficiency of the evidence of causation rather than its admissibility. CSX disagrees, relying on *Burton* to argue that the trial court erred in admitting Dr. RoBards' testimony concerning her study because Moody failed to

19. "The test for an abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

20. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

show a substantial similarity in the circumstances of the persons that she studied and also between them and Moody. CSX concludes that her testimony was substantially prejudicial and warrants a new trial. We disagree.

Unlike the situation in *Burton*, Dr. RoBards testified at Moody's trial. She stated that she began her study with the case of a patient who suffered from various neuropsychological deficits after working at CSX's South Louisville shops. The study consisted of surveying others who worked at the same place, at the same time, under the same working conditions, and with the same job description to determine if they had similar symptoms.[21] She found that they did. Dr. RoBards testified that Moody was one of the study participants. She concluded after conducting a neuropsychological evaluation that his symptoms were consistent with toxic encephalopathy. CSX did not object to the testimony.[22] Having failed to do so, CSX cannot complain that the trial court erred by failing to exclude the testimony.

## IV. Jury Instructions

The purpose of instructing a jury is to guide jurors in applying the law correctly to the facts in evidence. Pattern jury instructions used in FELA cases tried in federal court tend to be lengthy and detailed.[23] Kentucky state courts take a "bare bones" approach to jury instructions, however, leaving it to counsel to assure in closing arguments that the jury understands what the instructions do and do not mean.[24] A proper instruction correctly advises the jury " 'what it must believe from the evidence in order to return a verdict in favor of the party who bears the burden of proof' on that issue." [25] Regardless of what form jury instructions take, they must state the applicable law correctly and neither confuse nor mislead jurors.[26] A trial court has a duty to give a correct instruction when a party offers an erroneous or misleading instruction on a proper issue.[27]

### A. Foreseeability

The parties disputed whether the risks of Moody's exposure to solvents were foreseeable at the time of the exposure. Moody presented evidence that CSX knew or should have known of the risks to which it exposed him.[28] CSX as-

21. The symptoms included depression, anxiety, memory loss, and difficulties with concentration, balance, dizziness, and gait.

22. Near the end of her direct examination CSX did object when she began to refer to a chart that compared Moody with other individuals. Moody promptly removed the chart and it was not mentioned again.

23. *See, e.g.*, 3A Kevin F. O'Malley et al., Federal Jury Practice and Instructions, ch. 155 (5th ed.2001).

24. *See Lumpkins v. City of Louisville*, 157 S.W.3d 601 (Ky.2005); *Young v. J.B. Hunt Transportation, Inc.*, 781 S.W.2d 503, 506 (Ky.1989).

25. *Olfice, Inc. v. Wilkey*, 173 S.W.3d 226, 229 (Ky.2005).

26. *Drury v. Spalding*, 812 S.W.2d 713 (Ky. 1991).

27. *Murphy v. Harmon*, 291 Ky. 504, 165 S.W.2d 11 (1942).

28. Moody introduced a 1978 Material Data Safety Sheet (MSDS) for DowClene, which stated that prolonged skin contact could cause burning and that its vapors should not be inhaled, particularly in confined spaces. Moody testified that he worked in "pits," which were confined spaces, and introduced evidence that solvent vapors were heavier than air and collected in such areas. A 1980 MSDS warned that overexposure to Dow-Clene could cause organic injury, central nervous system depression, and death. Other evidence indicated that CSX's legal predecessors knew of the dangers posed by solvent use as early as the 1950s and 1960s.

serts that the trial court erred by refusing to give tendered instructions on foreseeability, particularly because it presented evidence that the scientific community had not linked the use of 1, 1, 1 trichloroethane or other solvents to toxic encephalopathy at the time of Moody's exposure. CSX tendered two proposed instructions.

Instruction 10 stated:

In order to find that CSX is guilty of negligence which in whole or in part resulted in the injuries of which plaintiff complains, you must find that the acts of the railroad were such that a reasonably prudent man would have known that they were *calculated to produce injury,* or, in other words, it must appear that the inquiry [sic] was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attendant circumstances, (emphasis added).

Instruction 13 stated:

CSX in this case was not required to guard its employees against that which reasonably prudent persons acting at the same time and under like circumstances would not anticipate as likely to happen. If, for example, someone has no reasonable ground to anticipate that a particular condition would or might result in injury, then he is not required to do anything to change such a condition.

Because the same substance may be dangerous in some circumstances and completely harmless in other [sic], the plaintiff, in this instance, must provide [sic] that it was reasonably foreseeable,

during the period between 1978 and present, when he was working for CSX, that solvents posed *a danger of solvent-induced encephalopathy* to employees employed as plaintiff was employed. Likewise, it is not enough to show that solvents may have been foreseeable as a danger to railroad workers with duties or working conditions different from that of plaintiff. For CSX to have acted negligently as to the plaintiff, a danger to him arising from his work practices must have been reasonably foreseeable to CSX. (emphasis added).

CSX states correctly that common-law negligence requires proof that the defendant knew or should have known that its conduct created a reasonable likelihood of injury. Moreover, the foreseeability of harm is an essential element of negligence under the FELA.[29] We conclude, however, that the trial court did not err because the requested instructions might have misled or confused the jury and because the trial court's instructions addressed foreseeability adequately.

*Gallick v. The Baltimore and Ohio Railroad Co.*[30] indicates that a defendant "need not foresee the particular consequences of [its] negligent acts" but only that its conduct would reasonably be anticipated to result in harm.[31] Thus, a defendant is liable for even the improbable or unexpectedly severe results of its negligence.[32] A separate foreseeability instruction is not required in FELA cases if the jury is instructed that the defendant's duty is "measured by what a reasonably prudent person would anticipate" under the same or similar circumstances.[33]

29. *Inman v. Baltimore & O. R. Co.,* 361 U.S. 138, 140, 80 S.Ct. 242, 4 L.Ed.2d 198 (1959).

30. 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963).

31. *Id.* at 120, 83 S.Ct. 659.

32. *Id.*

33. *Id.* at 118, 83 S.Ct. 659.

Mindful that a FELA defendant need not intend to harm the plaintiff or foresee the particular type of injury that occurred, we conclude that the tendered instructions might have misled the jury. The phrase "calculated to produce injury" might have led the jury to think erroneously that it could find for Moody only if it determined that CSX intended to injure him. Likewise, the reference to "a danger of solvent-induced encephalopathy" might have misled the jury to think erroneously that it could find for Moody only if it determined that CSX should have foreseen a reasonable likelihood that solvent exposure would cause him to develop toxic encephalopathy specifically. The trial court did not err in refusing the proposed instructions under the circumstances.

▮▮▮ The jury received instructions that complied with the foreseeability requirement as construed in *Gallick*. Instruction 3 informed the jury that negligence was "the failure to use the same degree of care which a person of ordinary prudence would use in the circumstances of a given situation." It also stated that negligence could be "the doing of something which a reasonably prudent person would not have done, or failing to do something a reasonably prudent person would have done under the circumstances."

The jury found under Instruction 4 that CSX "was negligent as defined in Instruction No. 3, and that such negligence was a cause in whole, or in part, of the claimed injury...." The jury made clear by doing so and answering affirmatively on Verdict Form No. 1 that it thought CSX should have realized when requiring Moody to use solvents as it did that such use could reasonably be anticipated to result in injury. *Gallick* indicates that the FELA requires no more.[34]

## B. Damages for Future Lost Wages

▮▮▮ The proper measure of damages in a FELA claim is a federal question.[35] Damages for future lost wages in FELA claims are exempt from taxation.[36] They are measured in after-tax dollars[37] and reduced (*i.e.*, discounted) to present value.[38]

### 1. Non-taxability instruction

CSX asserts that the trial court committed reversible error by refusing to instruct the jury as follows:

In the event that you determine to award the plaintiff a sum of money, you are instructed that the award is not subject to any deductions for federal or state income taxes.

▮▮▮ CSX relies on *Norfolk & Western Ry. Co. v. Liepelt*[39] for the principle that refusing to instruct the jury concerning the exemption from state and federal in-

---

34. 372 U.S. at 118–19, 83 S.Ct. 659.

35. *Chesapeake & O. Ry. Co. v. Kelly*, 241 U.S. 485, 491, 36 S.Ct. 630, 60 L.Ed. 1117 (1916).

36. 26 U.S.C. § 104(a)(2) (gross income excludes damages received on account of personal injuries); KRS 141.010(9) (adopts Internal Revenue Code definition of gross income).

37. *Norfolk & Western Ry. Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980).

38. *Kelly*, 241 U.S. at 490, 36 S.Ct. 630 (future benefits must be discounted unless an expectancy is so short that a reasonable person could not be expected to invest or purchase an annuity with the proceeds of the judgment).

39. 444 U.S. 490, 100 S.Ct. 755.

come tax[40] constitutes reversible error. Although we agree that the trial court erred by failing to give the requested instruction, we do not agree that the error compels us to reverse in this case.

As we determined today in *CSX Transportation, Inc. v. Begley*, 313 S.W.3d 52 (Ky.2010), *Liepelt* does not require a conclusion that a refusal to give a tax instruction always constitutes reversible error.[41] *Begley* acknowledges that CR 61.01 presumes erroneous jury instructions to be prejudicial and places the burden on the appellee to show a lack of prejudice. It notes, however, that the error may be viewed as being harmless if the result probably would have been the same absent the error and if the error was not so prejudicial as to merit a new trial. In *Begley* we viewed a verdict that was not excessive under the evidence as showing a probable lack of prejudice.[42]

■■■■■ A verdict is excessive under the evidence if it "cause[s] the mind at first blush to conclude that it was returned under the influence of passion or prejudice on the part of the jury."[43] Even if liberal, an award that does not shock the conscience or is not clearly excessive may not be set aside.[44] The award in the present case was not clearly excessive under the evidence.

The jury awarded a total of $2,540,000 in damages for future wage loss and past and future pain and suffering, which was slightly more than half of the $5,000,000 that Moody requested. Moody was 51 years old when the trial was held in 2003. Although he testified that he had intended to retire when he reached age 60, experience teaches us that circumstances change and that individuals often work to a later age than they had hoped to work at age 51. Moody testified that he had experienced memory loss and depression since the early 1980s and began to experience anxiety attacks sometime later.[45] Medical evidence indicated that he suffered from chronic toxic encephalopathy, a condition that could be treated but not cured; that the condition produced neuropsychological impairment, particularly affecting his memory, the ability to concentrate, and problem-solving skills; that it also produced depression, anxiety, and irritability, which were often disabling and apt to worsen over time; and that the difficulty he would have following instructions and finding jobsites rendered him incapable of employment.

We affirm because we are convinced that the verdict was reasonable and was not returned under the influence of passion or prejudice. The record indicates that the jury probably determined what amount would compensate Moody reasonably and did not inflate that amount in the mistaken belief that it would be taxed.

### 2. After-tax instruction

■■■ CSX asserts that the trial court committed reversible error by refusing to instruct the jury to calculate Moody's lost

---

**40.** *See* 26 U.S.C. § 104(a)(2) (gross income excludes damages received on account of personal injuries); KRS 141.010(9) (adopts internal revenue code definition of gross income).

**41.** 313 S.W.3d at 87–88.

**42.** 313 S.W.3d at 88–89.

**43.** *Louisville & Nashville Railroad Co., Inc. v. Mattingly*, 339 S.W.2d 155, 160–61 (Ky.1960).

**44.** *Id.*

**45.** Medical records indicated that a CSX nurse questioned in 1993 whether Dr. Vaughn found short-term memory loss as noted by Healthsouth and proposed a neuropsychological evaluation if he did.

after-tax earnings. An alternative argument relies on *Reusch v. Seaboard System R. R.*[46] for the proposition that Moody had the burden to prove his after-tax earnings in order to permit his future wage loss to be calculated and failed to meet that burden. We disagree.

Filed on June 27, 2003, Moody's itemized damage list stated that he earned approximately $67,000 per year plus approximately $14,000 in travel pay; thus, he would lose approximately $6,700 per month due to his inability to work. He testified at trial that he made $4,500 per month and intended to retire from CSX at age 60. He did not specify whether the $4,500 figure represented his gross or after-tax earnings. CSX failed to cross-examine him and, unlike the defendant in *Liepelt*,[47] offered no evidence of its own concerning taxes. When denying the tendered instruction the trial court noted and CSX conceded the impossibility of determining that $4,500 was not Moody's after-tax earnings. Moody questioned what tax rates the jury would apply if the $4,500 per month was reduced for taxes.[48]

 The trial court did not err by refusing the requested after-tax instruction because, even if we were to assume for the purposes of discussion that Moody's gross monthly earnings were $4,500, the jury

had no evidence from which to calculate his after-tax earnings. An instruction to reduce future lost earnings by the applicable taxes requires evidence of what the taxes would be or evidence to permit the jury to calculate taxes. *Liepelt* did not address which party is responsible for showing the applicable tax rates. Federal appellate courts that have addressed the matter since the *Liepelt* decision have concluded that the defendant is responsible.[49] We agree.

### 3. Present value instruction

CSX tendered the following instruction on present value:

> If you should find that the plaintiff is entitled to a verdict, and further find that the evidence in this case establishes either: (1) a reasonable likelihood of future medical expense, or (2) a reasonable likelihood of loss of future earnings, then it becomes the duty of the jury to ascertain the present worth in dollars of such future damages, since the award of future damages necessarily requires that payment be made now for a loss that will not actually be sustained until some future date.

> Under these circumstances, the result is that the plaintiff will in effect be reimbursed in advance for the loss, and so

---

46. 566 So.2d 489 (Ala.1990) (FELA plaintiff has burden to offer evidence concerning effect of taxation on future stream of income, interest rate on best and safest investments, and application of discount rate to alleged stream of income).

47. 444 U.S. 490, 100 S.Ct. 755.

48. When denying the instruction, the trial court and the parties agreed that they would brief the matter after trial and that the jury's verdict could be adjusted to account for taxes before judgment was entered if necessary. The court indicated earlier when denying CSX's directed verdict motion that additional

proof could be taken concerning taxation, if necessary. Although the trial court refused ultimately to adjust the verdict to account for taxes, by denying the oral motion for JNOV on November 21, 2003, CSX does not take issue with the ruling.

49. *See Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1351 (9th Cir.1987); *Deakle v. John E. Graham & Sons*, 756 F.2d 821, 830–31 (11th Cir.1985); *Fanetti v. Hellenic Lines Ltd.*, 678 F.2d 424, 432 (2nd Cir.1982), *cert. denied* 463 U.S. 1206, 103 S.Ct. 3535, 77 L.Ed.2d 1387 (1983). *See also CSX Transp., Inc. v. Williams*, 230 Ga.App. 573, 497 S.E.2d 66 (1998).

will have the use of money, which he would not have received until some future date, but for the verdict.

In order to make a reasonable adjustment for the present use, interest free, of money representing a lump-sum payment of anticipated future loss, the law requires that the jury discount or reduce to its present worth, the amount of the anticipated future loss, by taking (1) the interest rate or return which the plaintiff could reasonably be expected to receive on an investment of the lump-sum payment, together with (2) the period of time over which the future loss is reasonably certain to be sustained; and then reduce, or in effect deduct from, the total amount of anticipated future loss whatever that amount would be reasonably certain to earn or return, if invested at such rate of interest over such future period of time; and include in the verdict an award for only the present-worth—the reduced amount—of anticipated loss.

■ CSX asserts that the plaintiff in a FELA action has the burden to prove the present value of future lost wages.[50] Relying on *Jones & Laughlin Steel Corporation v. Pfeifer*[51] CSX also asserts that the trial court committed reversible error in this case by refusing to instruct the jury that damages for future wage loss must be reduced to present value. We disagree.

■ The Sixth Circuit has rejected arguments by railroads that damages for future wage loss are prohibited absent proof of a discount rate. In other words, the plaintiff is not required to produce evidence concerning the present value of future lost wages[52] in order to be entitled to damages for future wage loss. We adhere to the Sixth Circuit's view.

The U.S. Supreme Court determined in *Kelly*[53] that federal law requires future damages to be reduced to present value but considered the evidence admitted to assist the jury in making the computation to be "a matter of procedure and evidence . . . to be determined according to the law of the forum."

In *Pfeifer*,[54] a Jones Act case, the court acknowledged that "because the lost stream [of earnings] can never be predicted with complete confidence, any lump sum represents only a 'rough and ready' effort to put the plaintiff in the position he would have been in had he not been injured."[55] The court explained that the calculation of damages resulting from an injury begins with the assumption that the plaintiff would have continued to work until retirement. The calculation then attempts to compensate for the stream of income lost due to the injury, which depending on the proof may include not only present wages but fringe benefits as well as anticipated future wage increases due to inflation or cost-of-living adjustments, likely promotions, seniority, and merit raises.[56]

In order to compensate only for the plaintiff's actual pecuniary loss, the calcu-

**50.** 566 So.2d at 492; *Gorniak v. Nat'l R.R. Passenger Corp.*, 889 F.2d 481 (3rd Cir.1989); *Myrlak v. Port Authority of N.Y. and N.J.*, 302 N.J.Super. 1, 694 A.2d 575 (1997).

**51.** 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983).

**52.** *Baker v. Baltimore & Ohio Railroad Co.*, 502 F.2d 638 (1974); *Baynum v. Chesapeake and Ohio Railway Company*, 456 F.2d 658

(1972); *Pennsylvania Railroad Company v. McKinley*, 288 F.2d 262 (1961).

**53.** 241 U.S. at 490–91, 36 S.Ct. 630.

**54.** 462 U.S. 523, 103 S.Ct. 2541.

**55.** *Id.* at 546–47, 103 S.Ct. 2541.

**56.** *Id.* at 535–36, 103 S.Ct. 2541.

lation must account for the fact that most or all of the items in the earnings stream would be subject to income tax.[57] Likewise, the calculation must account for the fact that the plaintiff will receive the award in a lump sum rather than in periodic payments. That is accomplished by discounting the lump sum at a rate that is based not only on the return from investing the sum in "the best and safest investments" but also on the extent to which that return is likely to be offset by taxes and inflation.[58] The *Pfeifer* court refused to specify a mandatory formula for choosing the discount rate but rejected the application of a state's total offset rule as a matter of law, stating that the trier of fact must make "a deliberate choice." [59] The court noted, however, that nothing would prevent parties interested in controlling litigation costs from stipulating to the total offset method before trial.[60]

■ The trial court did not err in refusing CSX's present value instruction. It mentioned only some relevant factors and was not supported by any evidence. *Pfeifer* makes it clear that an appropriate discount rate considers three factors: the interest likely to be earned on the best and safest investments; the applicable tax rate on the interest; and the extent to which inflation would be likely to reduce the return further. Neither *Pfeifer* nor *St. Louis Southwestern Railway Co. v. Dickerson*[61] or *Monessen Southwestern Railway Company v. Morgan*,[62] both of which applied *Pfeifer* to FELA claims, addressed the evidentiary foundation necessary to require an instruction directing the jury to discount future wage loss damages.

Neither party introduced evidence concerning any of the factors comprising a discount rate in the present case or indicating that the interest likely to be earned would exceed taxes and inflation. Thus, no evidentiary basis existed to support an instruction that referred specifically to any of the factors. The trial court's Instruction No. 7 and Verdict Form No. 4 directed the jury "to determine from the evidence a sum of money that will fairly and reasonably compensate Troy Moody" for future lost wages. As the Sixth Circuit has observed:

> Jurors are presumed to be intelligent people, generally aware, from today's economy and their own experience with it, of the earning value of money when placed in safe investments.[63]

Jurors are also aware from their own experience that interest is taxed and that inflation reduces the value of money. The trial court could have said more on the subject than it did, but the instructions were adequate under the circumstances.

### 4. Future Medical Expenses

■ We affirm with respect to future medical expenses. Although Moody's cross-motion sought discretionary review of the Court of Appeals' decision to vacate his award of future medical expenses, he failed to address the matter in his brief to this court. We conclude for that reason that he has abandoned the issue.

57. *Id.* at 537, 103 S.Ct. 2541.

58. *Id.* at 537–40, 103 S.Ct. 2541.

59. *Id.* at 553, 103 S.Ct. 2541.

60. *Id.* at 550, 103 S.Ct. 2541.

61. 470 U.S. 409, 105 S.Ct. 1347, 84 L.Ed.2d 303 (1985).

62. 486 U.S. 330, 340–42, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988).

63. *Baynum v. Chesapeake and Ohio Railway Company*, 456 F.2d 658, 661 (1972).

The decision of the Court of Appeals is affirmed.

All sitting. All concur.