RENDERED: MARCH 6, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1133-ME

C.B. AND W.J.                                                            APPELLANTS


|  | APPEAL FROM HARDIN FAMILY COURT |
|---|---|
| v. | HONORABLE M. BRENT HALL, JUDGE |
|  | ACTION NO. 23-J-00238-001 |


CABINET FOR HEALTH AND FAMILY
SERVICES, COMMONWEALTH OF
KENTUCKY; HARDIN COUNTY ATTORNEY;
AND Z.A.J., A MINOR CHILD                           APPELLEES


AND

NO. 2024-CA-1134-ME

C.B. AND W.J.                                                         APPELLANTS


|  | APPEAL FROM HARDIN FAMILY COURT |
|---|---|
| v. | HONORABLE M. BRENT HALL, JUDGE |
|  | ACTION NO. 23-J-00236-001 |

CABINET FOR HEALTH AND FAMILY
SERVICES, COMMONWEALTH OF
KENTUCKY; HARDIN COUNTY ATTORNEY;
AND Y.J.J., A MINOR CHILD                                    APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CALDWELL, McNEILL, AND TAYLOR, JUDGES.

TAYLOR, JUDGE:  C.B. (Mother) and W.J. (Father), *pro se*, appeal findings of

the Hardin Family Court's orders entered July 3, 2024, and July 15, 2024, finding

that Mother and Father had abused and neglected their minor children (Z.A.J. and

Y.J.J.).[1]  Upon review, we affirm.

## BACKGROUND

On June 18, 2023, Z.A.J., who was at the time one month and four

days old, presented at Norton Children's Hospital (NCH) with respiratory distress,

rib fractures, a lacerated or bruised liver, bilateral subconjunctival hemorrhages

(bleeding to the white portion of the eyes), and what NCH's radiologist identified

as leg bone fractures and a transverse (back of the head) occipital skull fracture.

---

[1] The family court heard the cases involving both children together.  The adjudication orders in the dependency, neglect, and abuse proceedings were entered on July 3, 2024, and the final depositional orders were entered on July 15, 2024.  On appeal, the cases have been considered together by this Court.

Mother and Father, who identified themselves as Z.A.J.'s sole caregivers at all relevant times, offered no explanation for Z.A.J.'s injuries. Suspecting physical abuse as the cause, NCH reported the matter to the Cabinet for Health and Family Services (CHFS). Following an investigation, CHFS initiated dependency, neglect, and abuse (DNA) proceedings in Hardin Family Court and petitioned for custody of Z.A.J. on June 21, 2023. While Z.A.J. was in the hospital and out of concern for Y.J.J. (Z.A.J.'s older sibling by approximately one year), CHFS also petitioned for custody of Y.J.J. on grounds of abuse and/or environmental neglect.[2]

The family court subsequently granted CHFS's petitions, and CHFS has had custody of both children since June 21, 2023. Following an adjudication hearing, the family court found Z.A.J. and Y.J.J. to be abused or neglected children; and following a disposition hearing, the family court committed both children to the custody of CHFS. Mother and Father now appeal. Their arguments primarily contest the family court's findings of abuse of Z.A.J.[3] The substance of their arguments and additional facts will be discussed in our analysis.

---

[2] C.B. (Mother) and W.J. (Father) had taken urine screens that demonstrated positive for THC. An analysis of a hair sample from Y.J.J. was also positive for THC.

[3] The Court notes that appellant's briefs for both cases fail to comply with the Kentucky Rules of Appellate Procedure. Frankly, the Court could strike both briefs and dismiss the appeal. However, given appellants are proceeding *pro se*, and the case looks to the abuse and neglect of young children, the Court has declined to impose sanctions and has elected to address the merits of both cases upon a *de novo* review of the record below.

# STANDARD OF REVIEW

DNA proceedings are governed by Kentucky Revised Statutes (KRS)

Chapter 620. KRS 620.010 mandates that:

> [T]his chapter shall be interpreted to effectuate the
> following express legislative purposes regarding the
> treatment of dependent, neglected and abused children.
> Children have certain fundamental rights which must be
> protected and preserved, including but not limited to, the
> rights to adequate food, clothing and shelter; the right to
> be free from physical, sexual or emotional injury or
> exploitation; the right to develop physically, mentally,
> and emotionally to their potential; and the right to
> educational instruction and the right to a secure, stable
> family. It is further recognized that upon some
> occasions, in order to protect and preserve the rights and
> needs of children, it is necessary to remove a child from
> his or her parents.

"The burden of proof shall be upon the complainant, and a

determination of dependency, neglect, and abuse shall be made by a preponderance

of the evidence." KRS 620.100(3). The preponderance of the evidence standard is

satisfied if it can be proven that the child was "more likely than not" abused or

neglected. *Ashley v. Ashley*, 520 S.W.3d 400, 404 (Ky. App. 2017). Further:

> This Court's standard of review of a family court's
> award of child custody in a dependency, abuse and
> neglect action is limited to whether the factual findings of
> the lower court are clearly erroneous. Whether or not the
> findings are clearly erroneous depends on whether there
> is substantial evidence in the record to support them. If
> the findings are supported by substantial evidence, then
> appellate review is limited to whether the facts support

the legal conclusions made by the finder of fact. The legal conclusions are reviewed de novo.

*L.D. v. J.H.*, 350 S.W.3d 828, 829-30 (Ky. App. 2011) (citations omitted).

## ANALYSIS

The family court based its findings of abuse and/or neglect regarding Z.A.J. upon KRS 600.020(1)(a)1., 2., 3., 4., and 8. With respect to Y.J.J., it based its findings upon KRS 600.020(1)(a)2., 3., 4., and 8. Those provisions state in relevant part as follows:

(1) "Abused or neglected child" means a child whose health or welfare is harmed or threatened with harm when:

(a) His or her parent . . . . :

1. Inflicts or allows to be inflicted upon the child physical or emotional injury as defined in this section by other than accidental means;

2. Creates or allows to be created a risk of physical or emotional injury as defined in this section to the child by other than accidental means;

3. Engages in a pattern of conduct that renders the parent incapable of caring for the immediate and ongoing needs of the child, including but not limited to parental incapacity due to a substance use disorder as defined in KRS 222.005;

4. Continuously or repeatedly fails or refuses to provide essential parental care and

-5-

> protection for the child, considering the age of the child;
>
> . . . .
>
> 8. Does not provide the child with adequate care, supervision, food, clothing, shelter, and education or medical care necessary for the child's well-being when financially able to do so or offered financial or other means to do so. . . .

**1. Mother and Father do not challenge the family court's finding of environmental neglect**.

In their briefs, Mother and Father do not address one of the primary grounds upon which the family court found both children to be neglected, *i.e.*, its finding relative to KRS 600.020(1)(a)3. Specifically, the family court determined the results of Mother's and Father's June 21, 2023, urine drug screens and Y.J.J.'s hair analysis demonstrated Mother and Father had a history of drug use, had been using drugs at or near the time frame of Z.A.J.'s injuries, and that their drug use around their children had been extensive enough to cause Y.J.J., who was little over one year of age at the time, to metabolize THC. The family court also relied on the testimony of CHFS's expert, Dr. Melissa Currie, who testified that Z.A.J. was not tested because his hair was not long enough and there was also a chance that any positive result in a child less than a year old could have derived from in utero exposure. However, Dr. Currie concluded that if one of the children in the same environment tested positive for THC, it would cause her to be concerned for

both children.  By failing to address this finding of neglect, Mother and Father

have abandoned any contention that it was erroneous.  *See CSX Transp., Inc. v.

Moody*, 313 S.W.3d 72, 88 (Ky. 2010) (explaining a party's failure to address an

issue in an appellate brief results in the abandonment of that issue).  Accordingly,

the findings of environmental neglect for both children are affirmed.

Notwithstanding, we shall still review the family court's remaining findings of

abuse and/or neglect for both children.

**2. The family court's remaining findings of abuse and/or neglect are not clearly erroneous**.

In the family court's view, it was more likely than not that: (1) the

cause of Z.A.J.'s extensive injuries was repeated abuse (at least two episodes) from

Mother and/or Father; (2) because Mother and/or father had inflicted Z.A.J.'s

injuries, at least one of the parents knew when and how Z.A.J.'s injuries occurred,

and that parent did not seek immediate care for Z.A.J.'s injuries despite indications

that Z.A.J. was subsequently in pain;[4] and (3) the prior two factors in combination

demonstrated abuse, improper parenting, and medical neglect.  The court further

---

[4] With the exception of his bilateral subconjunctival hemorrhages, the remainder of Z.A.J.'s injuries were not outwardly visible.  However, the Cabinet for Health and Family Services' (CHFS) medical expert, Dr. Melissa Currie, opined that the (at least) two episodes of physical abuse to Z.A.J. caused him prolonged physical pain, particularly considering the extent of his injuries.  As further discussed herein, emergency room staff also documented Z.A.J.'s fussiness when they examined him on June 18, 2023, and documented that Mother indicated she noticed changes in Z.A.J.'s behavior (increased "fussiness") along with the subconjunctival hemorrhages a few days before taking him to Norton Children's Hospital (NCH).

concluded that permitting Z.A.J. and Y.J.J. to continue residing with Mother and Father presented a further risk of harm to both children.

Most of Mother's and Father's appellate arguments take issue with the first point of the court's ruling stated above regarding Z.A.J.'s injuries. We will summarize what the family court deemed persuasive in that regard, beginning with the family court's determination that, more probable than not, the only persons capable of inflicting Z.A.J.'s injuries during the relevant time frame were Mother and Father. There is no dispute that Z.A.J., at the time of his injuries, was incapable of injuring himself; he could not ambulate or roll over. Mother and Father made no mention to any medical professional or CHFS that Z.A.J. was dropped or sustained a fall. There is no suggestion that Y.J.J. caused Z.A.J.'s injuries or could do so. According to CHFS's investigating caseworker, Brittany Bowling, Mother and Father also related that Z.A.J. was not around any other adults during the ten-day period preceding Z.A.J.'s hospitalization on June 18, 2023,[5] except for a period of a few hours on June 17, 2023, when an aunt was present at their home for a birthday party. The aunt, who was interviewed, stated Mother and Father did not want other people taking care of the children. The only other indication that other adults were in Z.A.J.'s presence during the relevant time

_____

[5] Z.A.J. was also hospitalized at NCH from June 5 through June 8, 2023, for respiratory distress. On June 5 and 6, 2023, Z.A.J. received x-rays of his skeleton which NCH's radiologist deemed normal, and which CHFS's expert, Dr. Currie, later interpreted as not indicative of any fractures.

-8-

frame was Mother's and Father's recollection that a grandfather, one of the parents' stepmothers, and Mother's niece had briefly visited them in mid-June of 2023. However, Mother and Father never provided Bowling contact information for these individuals.

Next, we proceed to the evidence supporting the family court's determination that, more probable than not, physical abuse was the cause of Z.A.J.'s injuries. Because Mother and Father offered no direct explanation and chose not to testify at the adjudication hearing, the family court relied upon the medical evidence presented at the adjudication hearing and the opinions of CHFS's expert, Dr. Melissa Currie. As stated, Z.A.J. presented at NCH on June 18, 2023, with rib fractures, a lacerated or bruised liver, bilateral subconjunctival hemorrhages, and what NCH's radiologist identified as leg bone fractures and an occipital skull fracture. Dr. Currie, NCH's Chief of Pediatric Forensic Medicine, was consulted shortly thereafter. She is board-certified in Pediatrics and Child Abuse Pediatrics, and she rendered opinions in her September 15, 2023, final report and later in her testimony at the June 27, 2024, adjudication hearing.

With respect to Z.A.J.'s rib fractures, Dr. Currie reviewed the initial x-rays of Z.A.J.'s skeleton taken on June 18, 2023, and agreed with NCH's radiologist that they demonstrated Z.A.J. had lateral rib fractures (two fractures on the right side and one on the left side without callus; another on the left side with

callus) and posterior rib fractures (three fractures on the back right side and four fractures on the back left side, all with callus). She also reviewed the July 6, 2023, follow-up x-rays of Z.A.J.'s skeleton and agreed with NCH's radiologist that they demonstrated Z.A.J. had developed new callus formations in the fractures previously without callus, and also in additional locations in the left and right lateral and posterior sides of his ribs – indicating Z.A.J. had sustained fractures in those areas as well. Dr. Currie explained that posterior rib fractures are generally difficult to cause because the posterior is protected by the spine; and they are particularly difficult to cause in babies because a baby's ribs are more flexible and bend a great deal before breaking. Based upon the extent and locations of the fractures, she opined they were not caused by a direct blow to Z.A.J.'s front or back and could only have been caused by violent squeezing forces very specific for abuse.

Dr. Currie further testified that considering the callus formations, Z.A.J. had sustained his rib fractures by being violently squeezed on at least two separate occasions prior to June 18, 2023. Thus, the presence of some fractures with callus and others without it on the June 18, 2023, x-ray made it more probable than not that those respective fractures were inflicted at different times. Both Dr. Currie and Mother's and Father's expert, Dr. Daniel Cousin, testified that multiple instances of physical trauma were indicative of abuse.

Regarding the additional fractures detected in the July 6, 2023, follow-up x-ray, Dr. Currie testified that rib fractures are typically very difficult if not impossible to visualize on an x-ray until – as was observed in that latter x-ray – they develop callus formations and begin to heal. No acute fractures were identified on the July 6, 2023, follow-up x-ray, and nothing otherwise of record indicates Z.A.J. sustained physical trauma between his admission to NCH on June 18, 2023, and his follow-up x-rays of July 6, 2023. Dr. Currie's opinion was that Z.A.J. had more likely than not sustained the entirety of his rib fractures prior to his hospitalization on June 18, 2023, while Mother and Father were acting as his sole caregivers.

With respect to Z.A.J.'s liver, NCH performed a CT scan on Z.A.J.'s abdominal region on June 19, 2023, after lab results indicated his ALT liver enzyme level was 170 (the upper limit of normal was 33). The CT scan revealed either a liver tear or contusion. Dr. Currie noted the liver is fairly deep in the abdomen and relatively protected by the ribs. As such, liver tears and contusions result from intrusive, high-energy forces to that region and are commonly found in older, mobile children who have been involved in serious accidents or fights. Absent any indication Z.A.J. was mobile or was involved in an accident, Dr. Currie opined Z.A.J.'s liver injury likely resulted from physical abuse. She testified Z.A.J.'s liver injury was unrelated to his broken ribs because those had resulted

-11-

from lateral and posterior injuries (squeezing), and Z.A.J.'s liver injury was an anterior (front) injury likely caused by a direct blow. She further testified it likely occurred prior to Z.A.J.'s hospitalization on June 18, 2023, while Mother and Father were acting as his sole caregivers.

With respect to Z.A.J.'s legs, NCH's radiologist identified six healing metaphyseal fractures present on Z.A.J.'s right and left femurs and shin bones evident on Z.A.J.'s June 18, 2023, x-ray. Dr. Currie agreed with those findings. She added that any long bone fractures in a baby, such as Z.A.J., that is not up walking around and doing things that could lead to a fall or accidental injury give rise to concerns of physical abuse; and that the type of fractures Z.A.J. had ("corner" or "bucket handle" fractures) are highly specific for inflicted child physical abuse.

With respect to Z.A.J.'s skull injury, NCH's radiologist identified a transverse (on the back) occipital fracture, ruling out the potential that the fracture may have instead been an otherwise naturally occurring "Wormian bone."[6] Dr. Currie agreed with that finding, adding that a transverse fracture on a skull is not normal and is a sign of physical trauma.

---

[6] "Wormian bones," explained Dr. Currie, are extra bone pieces that can naturally develop within the sutures of the skull.

Lastly, with respect to Z.A.J.'s subconjunctival hemorrhages, Dr. Currie explained on page 12 of her September 15, 2023, final report:

> Subconjunctival hemorrhages can be caused with a direct blow to the face, strangulation, or increased intrathoracic or intrabdominal pressure such as squeezing. Subconjunctival hemorrhages can occur as a result of forcefully vomiting or coughing. However, it is unusual to have bilateral subconjunctival hemorrhages from vomiting or coughing mechanisms. Given [Z.A.J.'s] constellation of injuries, it is much more likely that the subconjunctival hemorrhages are a result of physical abuse.

Record at 117.

Dr. Currie later amended her opinion during the adjudication hearing. There, she testified that since rendering her final report, new research involving thousands of hours of case studies demonstrated that forceful crying or forceful vomiting was not a reasonable explanation for subconjunctival hemorrhages found in infants.

Mother and Father contend the family court should have disregarded Dr. Currie's testimony because Dr. Currie: (1) admitted that the medical records she reviewed did not include the records indicating Z.A.J. received CPR shortly after he was born; (2) admitted the medical records she received did not include the records indicating Mother had taken Z.A.J. to several pediatric appointments prior to his June 18, 2023, hospitalization; and (3) relied upon "hearsay" to arrive at her

-13-

opinion that Z.A.J. suffered prolonged physical pain prior to his June 18, 2023, hospitalization.

At best, however, these points merely affected the weight of Dr. Currie's testimony. Dr. Currie explained that there was no medical evidence that CPR administered to Z.A.J. after birth could have caused any of Z.A.J.'s injuries. She opined that irrespective of how many times Z.A.J. might have been taken to pediatric appointments prior to his June 18, 2023, hospitalization, Mother and/or Father knew days before his hospitalization how and when Z.A.J. sustained his injuries. Dr. Currie also opined that Z.A.J. had been in prolonged pain for days prior to when he was hospitalized on June 18, 2023, relying upon Mother's statements to medical personnel and the statements of medical personnel set forth in Z.A.J.'s June 18, 2023, emergency room records.

Even if Mother and Father had objected to the admission of this evidence – which they did not – Mother's statements were admissions, not hearsay; and the statements of the medical personnel regarding their own observations of Z.A.J.'s condition were admissible hearsay pursuant to Kentucky Rules of Evidence (KRE) 803(4).

Mother and Father also contend the family court should have disregarded Dr. Currie's testimony because they presented contrary, compelling evidence in support of their alternative theory of how Z.A.J. sustained most of his

fractures. Their alternative theory was in line with the testimony provided by their expert radiologist, Dr. Daniel Cousin, who conducted a review of Z.A.J.'s medical records. His theory was that Z.A.J. suffered at all relevant times from a condition that caused him to have fragile, "gracile" bones, perhaps osteogenesis imperfecta ("OI"). This effectively was the cause of his injuries, not abuse.

However, virtually every aspect of their theory conflicts with other evidence or is unsupported. We begin with the premise that Z.A.J. suffered at all relevant times from a condition that caused him to have fragile bones. This was the opinion of Mother's and Father's expert, but no objective medical evidence supported it. To the contrary, testing revealed no abnormalities in Z.A.J.'s bones. NCH assessed Z.A.J.'s calcium, phosphorous, and magnesium levels, all of which were normal. Z.A.J. had a vitamin D insufficiency, not a deficiency; his vitamin D levels were deemed to be only slightly low. Dr. Currie testified that a vitamin D deficiency is not uncommon in newborns, but Z.A.J.'s levels were not low enough to explain his fractures.

Additionally, NCH tested Z.A.J. for OI and conducted a bone fragility panel, with the results being normal. Z.A.J.'s OI test did detect a variant of unknown significance (VUS). However, a VUS is exactly that – of *unknown* significance to OI, not demonstrative of it. If Z.A.J. did have OI, Dr. Currie testified, then Z.A.J. would have continued suffering new fractures after he was

-15-

discharged from the hospital and placed in foster care, given OI is a lifelong genetic disorder. That did not happen. Z.A.J. was given another follow-up skeletal x-ray at NCH on February 1, 2024, and his x-ray was completely normal.

The remainder of Mother's and Father's argument also conflicts with skeletal x-rays NCH took of Z.A.J. when Z.A.J. was hospitalized at NCH from June 5 through June 8, 2023, for respiratory distress and pneumonia. Mother's and Father's expert did not address those x-rays at all; and those x-rays were interpreted by NCH's radiologist and Dr. Currie as completely normal. Dr. Currie did testify she was unaware that Z.A.J. had been given CPR shortly after being born. But she added that if CPR or birth complications had fractured any of Z.A.J.'s bones on May 15 or 16, 2023, those fractures would have developed callus or would have otherwise been visible by x-ray during Z.A.J.'s June 5 through June 8, 2023, hospitalization. CPR also could not have caused the fractures to Z.A.J.'s legs. In any case, the x-rays taken of Z.A.J. during his June 5 through June 8, 2023, hospitalization indicated his legbones and ribs were normal.

Dr. Currie also discounted the claim that CPR administered to Z.A.J. on May 15, 2023, could have caused Z.A.J.'s liver injury. She testified no medical studies have demonstrated CPR causes liver lacerations in infants. The family court also explained from the bench, at the conclusion of the adjudication hearing, that it did not believe the force of the CPR administered to Z.A.J. could have been

sufficient to cause his liver injury. Again, Mother's and Father's argument was that the force of the CPR Z.A.J. had received in May of 2023 had been enough to cause Z.A.J.'s fractured ribs. But as Dr. Currie testified, Z.A.J. would have had callus formations on any such fractures ten to fourteen days later. As noted by the family court, Z.A.J. had no observed fractures or callus when he was x-rayed more than twenty days after receiving CPR. Record at 254.

Overall, there was substantial evidence presented to support the court's findings of abuse and neglect. Dr. Currie's testimony was not speculative as Mother and Father argue but based upon reasonable inference from the medical records. Mother's and Father's evidence to the contrary did not compel a different result. Accordingly, the family court committed no error or abuse of discretion in its assessment of the evidence and findings of abuse and neglect of Z.A.J.

**3. Mother and Father identify no palpable error**.

Before concluding our analysis, Mother and Father ask this Court for palpable error review of several issues they admittedly[7] failed to preserve below, *i.e.*, that in their view: (1) the family court should have exercised its gatekeeping function and excluded some or all of Dr. Currie's expert opinions; (2) Dr. Currie should not have been permitted to opine, during the adjudication hearing and for

---

[7] Mother and Father concede in their reply brief that these issues are unpreserved. The reply brief also provides appellants an opportunity to request palpable error review of otherwise unpreserved issues. *See Commonwealth v. Jones*, 283 S.W.3d 665, 670 (Ky. 2009).

the first time, that forceful crying or forceful vomiting is not a reasonable explanation for subconjunctival hemorrhages found in infants; (3) the family court, by asking certain questions of the witnesses and making certain comments, evinced bias in favor of CHFS during the adjudication hearing; (4) this Court should consider on appeal certain evidence (*i.e.*, a genetic report) that they never presented below; and (5) a *Brady*[8] violation occurred.

With respect to their first argument, "[w]e decline to speculate on the outcome of an unrequested *Daubert*[9] hearing, or to hold that the failure to conduct such a hearing *sua sponte* constitutes palpable error." *Tharp v. Commonwealth*, 40 S.W.3d 356, 368 (Ky. 2000). With respect to their second argument, we discern no manifest injustice. Dr. Currie's opinion rendered months prior to the adjudication hearing (as set forth in her September 15, 2023, report), stated that Z.A.J.'s bilateral subconjunctival hemorrhages were more likely than not indicative of physical abuse. Her testimony at the adjudication hearing supported her position and did not equate to manifest injustice. More importantly, Mother and Father had ample opportunity to cross-examine Dr. Currie at the hearing.

With respect to their third argument, Mother and Father cite what they view as two instances of bias. First, they believe the family court was biased when

---

[8] *Brady v. Maryland*, 373 U.S. 83 (1963).

[9] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

it "assisted and answered opposing counsel" regarding the questions asked of Dr. Currie. However, the portion of the record they take issue with does not show bias. The record demonstrates Mother's and Father's counsel asking Dr. Currie questions she had already answered,[10] and the family court reminding their counsel what Dr. Currie's prior answers were. Second, appellants believe the family court evinced bias when, in summarizing Dr. Currie's testimony at the close of CHFS's case, it commented that it was "pretty complete." However, the family court made that comment when ruling on and denying Mother's and Father's motion to have CHFS's DNA case involuntarily dismissed for insufficient evidence. *See* Kentucky Rules of Civil Procedure 41.02(2). Given this context, the family court was not demonstrating bias but merely indicating CHFS had satisfied its burden to present a *prima facie* case of abuse.

With respect to their fourth argument, as a court of review, we are not permitted to consider evidence offered for the first time on appeal. *See Naramore v. Naramore*, 611 S.W.3d 281, 289 (Ky. App. 2020); *Oakley v. Oakley*, 391

---

[10] *See* June 27, 2023, hearing at 10:02-10:05 a.m. During this time, when Mother's and Father's counsel asked Dr. Currie a second time if she had received and reviewed Z.A.J.'s medical records from Elizabethtown Pediatrics, the family court stated, "She said she did," immediately before Dr. Currie answered again in the affirmative. Their counsel then asked Dr. Currie to again clarify her opinion regarding medical neglect, and the family court stated: "She said that somebody knew, somebody in the caregiving role knew that the injuries had been inflicted and did not initially seek medical intervention because, on the 6/18 admission, there were acute fractures and callus present, which means multiple dates of inflicted injury, per her testimony and conclusions." Dr. Currie then agreed with that statement.

S.W.3d 377, 380 (Ky. App. 2012). Such a request is untimely and not permissible by this Court.

With respect to their fifth argument (*i.e.*, the purported *Brady* violation), Mother and Father complain the family court's opinion and order overlooked certain medical evidence, including that on June 18, 2023, NCH's ophthalmologist noted Z.A.J. had "no retina hemorrhages on dilated fundus"; NCH orthopedics noted Z.A.J. had "no ecchymosis" (bruising or bleeding under the skin) in the area of his leg fractures; that Z.A.J.'s vitamin D level was noted as being low; and that NCH determined Z.A.J. had the WNT3A gene. Appellant's Brief at 9 (Y.J.J.). However, that evidence was set forth in the medical records admitted at trial, and it was discussed by Dr. Currie during her trial testimony. A *Brady* violation occurs when material evidence is *suppressed*,[11] and that information was not suppressed.

Finally, as concerns Y.J.J., appellants' brief presents a one-sentence argument and fails to present any substantive basis to overcome the family court's detailed findings of abuse and/or neglect of Y.J.J. Appellant's Brief at 3 (Y.J.J.). As noted, appellants failed to address the environmental neglect finding of Y.J.J. in their brief and there was substantial evidence that Y.J.J. was exposed to a serious risk of physical harm if he remained with his parents. Given the extent of the

---

[11] *See Commonwealth v. Bussell*, 226 S.W.3d 96, 99-100 (Ky. 2007).

injuries to Z.A.J., we find no error in the court's findings of abuse and/or neglect of Y.J.J.

## CONCLUSION

Based upon our thorough review of the record below regarding both children, Mother and Father have failed to identify any reversible error, palpable or otherwise by the family court, nor are the court's findings clearly erroneous. Accordingly, we affirm the adjudication and disposition orders in both cases.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

C.B. and W.J., *Pro Se*
Radcliff, Kentucky

BRIEFS FOR APPELLEES:

Alison Tefft
Assistant Hardin County Attorney
Elizabethtown, Kentucky